27 C.C.P.A. (Patents)

## AKERS v. PAPST.
### Patent Appeal No. 4342.

Court of Customs and Patent Appeals.
July 8, 1940.

A. H. Golden, of New York City, for appellant.

Samuel Scrivener, Jr., of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding to appellee priority of the invention described in the single count of the interference, 'which count reads as follows: "A door lock including an outside handle retractable into and projectable from a recess in the outer side of a door to which said lock is applied, yieldable means exerting a constant force tending to project said outside handle from said recess, an inside handle, means for releasably holding said outside handle in retracted position against the action of said yieldable means, and means connecting said handles to retract said outside handle by operation of said inside handle and to release said holding means to permit said yieldable means to project said outside handle independently of said connecting means."

Appellant's application was filed on December 28, 1933. Appellee's application was filed on June 27, 1935.

It appears that in a decision of the Primary Examiner upon a motion to shift the burden of proof appellee was held to be entitled, under the provisions of section 4887, R.S., 35 U.S.C.A. § 32, to the filing date, December 16, 1932, of his German application for conception and constructive reduction to practice of the invention. This ruling is not challenged by appellant.

The subject matter of the invention involved is primarily a door lock for automobiles and is sufficiently described in the quoted count.

It appears that originally there were three other parties to the interference. Two of them seem to have been eliminated prior to final hearing; the reasons for their elimination do not appear in the record.

Upon final hearing before the Examiner of Interferences there were three parties, viz., the parties herein and a party Elliott and Hudson. This last named party did not appeal to the Board of Appeals from the decision of the Examiner of Interferences awarding priority of invention to appellee.

Of the parties involved in this appeal only the appellant took testimony, appellee relying upon his German filing date as aforesaid.

The Examiner of Interferences held that appellant had not established conception of the invention prior to appellee's German filing date, and therefore awarded priority of invention to appellee.

Appellant testified that he was a retired steamboat captain and had made a number of inventions prior to his claimed conception of the invention here involved; that in the early part of 1930 he conceived a structure that would function to retract the outside handle of a door into a recess in the face of the door and project the same from said recess, operative through a handle on the inside of the door, and that said outside handle, when retracted into said recess, could be projected therefrom by means of a key inserted into the lock from the outside of the door. He testified that he was then without means or income, but had a little shop in the basement of his home where he constructed by hand a model of the invention, which functioned successfully in accordance with his conception. There was introduced in evidence Akers' Exhibit No. 2. With respect to this exhibit the Examiner of Interferences in his decision stated: "The party Akers testified that he built a lock in 1930 and identifies Ex. 2 as the frame used at that time. The frame in its present condition does not embody a complete lock, but merely has a few parts which presumably are parts of a complete lock. Akers testified that some of the parts of the original lock were used in a device built subsequently in 1933 (Akers Rec. p. 15 Q. 61) and that some of the parts were junked (Akers Rec. p. 16 Q. 66)."

Regarding the operation of this exhibit as originally constructed, appellant testified as follows:

"Q. 34. Captain Akers, will you please describe to us the operation of the lock which you say you built in 1930, and installed in the wooden door of your exhibit two? A. It was manufactured and built so that the outside handle on the door, was encased in a recess in the face of the door, so that when the handle was enclosed into that recess, it became flush with the face of the door. The handle on the inside, by turning it in one direction it first ejected the handle on the outside, and then by the continuation of that movement of the inside handle, it released the latch bolt or lock bolt that allowed the door to be swung open, all in one continuous movement of the handle from the inside. Then when you got in the car and closed the door from the inside, with the inside handle, it pulled that handle into the recess. The same handle had a latch on it which caused it to become locked when the door was closed. The outside handle also had a flat spring arranged so that the first movement in opening the door, the first movement released the latch in that handle and a flat spring which was bearing on the base end of the handle flopped the handle out. Also when you operated the inside handle to close the door, the outside handle would press that spring and carry it in so that the handle would be in the flush position.

"Q. 35. Were you able to remove the outside handle from its recess, by operation from the outside? A. You were by the means of the key lock that was embodied in the model. In other words, when you were on the outside, the only way that handle could be opened, was by means of a key which allowed you to liberate that catch on the outside handle, and the spring naturally flopped it out.

"Q. 36. Captain Akers, you testified that when you rotated the inside handle in one direction, you first released the outside handle so that it flopped out of its recess under the impulse of a spring? A. Yes sir.

"Q. 37. And that thereafter the latch bolt was retracted by the continuous movement of the handle. Now with the outside handle out of the recess, will you explain more fully how the outside handle could be brought into its recess by the operation of the inside handle, in a different way? A. Well, it was very simple in

the manner that the connections on the inside of the model were such that when you turned the handle from the inside, you turned it in the opposite direction from what you did in opening the door, and detracting the outside handle as it pulled the outside handle and latched it.

"Q. 38. In other words, by a rotation of the handle in a direction reverse to that of releasing the outside handle, you pulled the outside handle in? A. Yes sir."

Appellant further testified that he showed his model in 1930 to members of his family and to two other persons who saw the handle and lock operate. With regard to this disclosure appellant testified:

"Q. 45. Did you operate the lock and did it work properly in this year of 1930, when you showed it to these witnesses? A. Yes sir.

"Q. 46. Did you slam the door shut, and did the lock bolt operate, and did the handle function properly all this time. A. Yes sir. The others, in each and every case, if they wouldn't do it of their own volition, I would request them to operate it both ways, and slam the door, and they did it many times."

Appellant further testified that thereafter he showed the invention to his patent attorney, but that he then had no immediate prospects of interesting anybody in the invention, and as he was without means he did not then proceed with an application for a patent.

Appellant testified that in January, 1931, he showed Exhibit 2 as originally constructed to one Cloutier, who was body engineer for the Graham-Paige Motor Company, but was not then successful in securing his active interest in it; that in the Spring of 1933 he again saw Cloutier, and again showed him Exhibit 2, and that Cloutier then caused to be furnished to him a regulation scrap automobile door; that appellant caused a section to be cut out of said door which contained the handle and lock mechanism. With reference to this section of door appellant testified as follows:

"Q. 61. What did you then do with the Graham-Paige door that was left in your possession? A. I proceeded immediately to install the door handles and lock on the same principle as was in the original wooden model, using some of the parts that were in the original wooden model, in the construction of this.

"Q. 62. Captain Akers, do you recall whether or not the lock that was incorporated in the wooden model, was re-built by you, for the purpose of obtaining a better operating construction? A. I worked continuously on that wooden model during the year 1931 and 1932, endeavoring to eliminate a great many of the numerous parts of it, to reduce it down to a simplified form that the automobile manufacturer could entertain, in fact I am sure I tore that model apart as much as twelve or fifteen times, and re-built it, before I had gotten it down to the simplicity that could be used on an automobile.

"Q. 63. In other words, Captain Akers, should I be led to understand that while the original lock that you made and incorporated in the wooden model, operated satisfactorily, you nevertheless felt that the cost of the lock was too high because of the number of parts, and that all this period of time you were continuously working on cutting down the number of parts? A. I would say absolutely.

"Q. 64. And during all this time, you were receiving help from your son? A. I was. In other words, I had no income whatever.

"Q. 65. You testified that you used some of the parts of the lock built into the wooden model, in the new lock which you built into the lock applied to the Graham-Paige door. Do you recall what happened to the other parts that are not incorporated in the Graham-Paige door? A. Yes sir.

"Q. 66. Tell us what happened to those parts. A. During all the years that I have worked on models of inventions, I have made it a practice that after I got through with that model, almost invariably I scrapped the whole thing and it was carried out in the alley for the trucks to haul away. Some of the parts of that original model, it was my custom to throw them in a box. When the box got full, I would carry it out in the alley and dump it, because the room in my basement shop was so limited that you could hardly walk around it."

The section of door referred to was marked "Akers' exhibit seven," whereupon appellant further testified as follows:

"Q. 71. Is the lock that I see built into this exhibit seven, the lock which you just testified you built in 1933, after receiving the door, and which lock contains some of the parts of your original lock

built into the wooden door frame, Akers' exhibit two? A. It is.

"Q. 72. Have you compared in your mind, the operation of this lock, your exhibit seven, with the operation of your original lock, exhibit two? A. I have. It absolutely functions the same as exhibit two.

"Q. 73. In other words, this new lock that you built, exhibit seven, operates in the same manner as your original exhibit two? A. It does.

"Q. 74. What is the difference between the two, other than the general operation? A. There is no difference in the principle, notwithstanding this exhibit seven has numerous eliminations of parts that were in the original exhibit number two, and it is built to the effect of being in more of a marketable shape than the first exhibit two.

"Q. 75. In other words, Captain Akers, this last lock of yours, exhibit seven, has considerably less parts, while performing the same operations, as exhibit two? A. Many less parts.

"Q. 76. When you had completed this exhibit seven, did you take it to your patent attorney? A. I did.

"Q. 77. And did he proceed to file a patent application? A. He did.

"Q. 78. And is that patent application the same application that is involved here in interference? A. It is.

"Q. 79. And do the drawings of your application in interference, show the construction of this lock, exhibit seven? A. The drawings for the application were made absolutely from this construction, exhibit number seven."

It is conceded that said Exhibit 7 supports the count before us.

The witnesses relied upon by appellant for corroboration of his testimony all testified as to the successful functioning of Exhibit 2 in its original condition, but none testified as to the interior structure of the exhibit in its original form.

It is unnecessary to analyze in this opinion the testimony of such witnesses because appellant's brief states as follows:

*"Theory of Akers' Case*

"The issue in this case is very simple. Akers admits that neither he nor his witnesses were able to describe the structural details of Exhibit 2, that is, the lock which was completed in 1930 and dismantled. As the Board of Appeals pointed out, R49, last paragraph, Akers rebuilt the lock twelve to fifteen times, and naturally, neither he nor his witnesses could remember the several constructions.

"Similarly, the witnesses that examined Exhibit 2 were obviously not able to describe its structural details because they were interested only in the function of the handles. As a matter of fact, the structural details were not available for close inspection since the lock was mounted in a door.

"It is Akers contention that the invention in issue resides only in conception and in function, with no real value in the actual structure; therefore, Akers contends that it is not vital to his case that neither he nor his witnesses could testify to the actual structural details of Exhibit 2, so long as he and his witnesses did understand the conception and function of the lock. Akers contends that a person skilled in the art could build the lock in interference if that person read the testimony relating to the function and operation of Exhibit 2."

We think the above quotation fairly presents the issue which we are called upon to decide.

If the count included only means, without further specification, for performing certain functions, the argument of appellant's counsel that the testimony herein, establishing that such functions were successfully performed, is sufficient to entitle appellant to an award of priority would be entitled to serious consideration; but unfortunately, perhaps, for appellant, that question is not before us because the count does not merely embrace means for performing the functions stated in the count, but the first means recited in the count must be a specific kind of means, viz., a "yieldable means exerting a constant force tending to project said outside handle from said recess," and the count also provides that the outside handle is projected independently of the connecting means which connects the inside handle with the outside handle to retract the latter.

These limitations in the count must be regarded as material and in order for appellant to succeed they must be established as a part of his conception and reduction to practice of the invention.

■ It is elementary in patent law that, while counts of an interference are to be interpreted as broadly as their language will reasonably permit, express limitations cannot be ignored.

It is true that, with respect to the "yieldable means" recited in the count, appellant testified that in Exhibit 2 he employed "a flat spring which was bearing on the base end of the handle." This would, if corroborated, have supported the limitation above referred to, but it is admitted that there was no corroboration of the employment of a spring in the mechanism. It is true that some of appellant's witnesses testified that upon turning the inside handle part way the outside handle was "flipped out" or "snapped out" of the recess, but, assuming that this would imply the presence of a spring in the mechanism, it does not establish that such spring "exerted a constant force" tending to project the outside handle from the recess. Appellant testified that he rebuilt the mechanism many times after the construction of Exhibit 2, eliminating many parts, and it may have been, for aught that we can say, that when the outside handle was in its retracted position the spring did not exert a constant force to project said handle, but there may have been another part which held the spring in a contracted position so that the spring could not come into pressure contact with the base of the handle until some other part was released, permitting such pressure contact.

Moreover, we can conceive that Exhibit 2 in its original condition might have successfully functioned without the employment of a yieldable means such as a spring. A cam arrangement might have been employed to eject the handle from the recess.

With respect to the element of the count requiring that the outside handle is projected independently of the connecting means which connects the inside handle with the outside handle to retract the latter, there is nothing in the testimony of appellant's witnesses indicating any knowledge of the existence of this element.

There is nothing in the record establishing that appellant, prior to appellee's German filing date, disclosed to the witnesses who testified in his behalf or to others the two elements of the count above described, and there is no evidence, other than that of appellant himself, that Exhibit 2 contained either of said elements.

Before the successful operation of Exhibit 2 as originally constructed can be held to constitute a reduction to practice of the invention defined in the count, it must appear by evidence corroborating the testimony of appellant that all of the elements set out in the count were present in said exhibit.

■ It is no reflection upon appellant's testimony to hold that corroboration is required. Such corroboration in interference proceedings is a positive rule of patent law. George v. Karsel, 111 F.2d 148, 27 C.C.P.A., Patents, ——; Janette v. Folds et al., 38 F.2d 361, 17 C.C.P.A., Patents, 879; Fausek et al. v. Vincent, 92 F.2d 909, 913, 25 C.C.P.A., Patents, 770.

The case last above cited is in principle very similar to the case at bar. In that case the count called for a valve stem having an imperforate head. The appellants, joint inventors, testified that a certain exhibit embodied all of the elements of the count, including an imperforate valve head, and that it was successfully operated prior to appellee's conception date. A witness relied upon for corroboration of such testimony testified that he saw the mechanism successfully operated, and that from such operation he concluded that the valve "closed tight;" that he had not seen anything more of the interior construction than the point of the valve. In holding that this testimony was not sufficient to corroborate the testimony of appellants as to the successful operation of said exhibit, we said: "In view of this testimony, which shows that the witness did not know from visual observation whether or not the head of the valve stem was imperforate, we do not think that the testimony of appellants respecting the successful operation of Exhibit 3 was sufficiently corroborated, and without such corroboration the test of Exhibit 3 cannot be held to be a reduction to practice of the invention. * * *"

■ In interference cases, to establish reduction to practice it must appear that the device tested included all elements of the count. Greene et al. v. Beidler, 2 Cir., 58 F.2d 207.

In the case of King v. Young, 100 F.2d 663, 669, 26 C.C.P.A., Patents, 762, it was held that a certain device constructed and successfully operated by appellee con-

formed to the count in issue, and that a device constructed and successfully operated by appellant did not so conform. In our decision we stated: "It may be that appellant's said device accomplished the same purpose as appellee's Exhibit 6. This we are not called upon to determine, for it is well established that in interference counts express limitations may not be ignored. Sweetland v. Cole, 53 F.2d 709, 19 C.C.P.A., Patents, 751."

Appellant relies upon our decision in the case of Levy v. Gould et al., 87 F.2d 524, 530, 24 C.C.P.A., Patents, 910, in support of his contention that the evidence in his behalf entitles him to an award of priority of invention. In that case three interferences were involved. In our decision we said that the counts in the first two interferences were so broad as to cover broadly automatic control for a radio receiving set. The only question arising in these two interferences was whether the dates and original condition of certain drawings and exhibits disclosing the invention were sufficiently established. We decided this question in the affirmative. We further held that appellant's disclosures and demonstration of the invention were made to some of the witnesses who could and did understand the invention expressed in the counts.

As to the third interference, however, we held that the sole count there involved contained a positive limitation which the Patent Office tribunals held was not supported by the evidence relied upon by appellant in that case. In our decision we stated: " * * * It has not been made clear to us that the tribunals below are in error in this position, and in view of the fact that the testimony of the witnesses to whom Levy's alleged disclosure was made is general and not sufficiently specific to the particular structure involved in the count, we do not feel justified in reversing the decision of the board as to its award of priority of invention to the party Rice in interference C. * * *"

In appellant's brief it is stated: "The count is naturally broad, therefore, and no structural detail need be considered. This is, of course, further appreciated by noting the Akers and Papst structures. *These structures have nothing in common except result, function, and conception.* Were it not for resemblance as to result, function, and conception, there would be no interference between Papst and Akers." (Italics quoted.)

In this appellant's counsel is clearly in error, for the limitations in the count do define structure, and it is not true that the structures described in the applications of the respective parties "have nothing in common except result, function, and conception." Both applications disclose each element of the count, including "yieldable means" and other limitations relating to structure. Were it not so the interference could have been dissolved for lack of disclosure of the limitations in the application in which such limitations were absent.

In conclusion, we are constrained to hold upon the record before us that the decision of the Board of Appeals should be affirmed. We are impressed by the frankness and candor of appellant and his witnesses in their testimony, but it is so elementary that positive limitations in a count may not be ignored in an interference proceeding that we cannot do otherwise than hold, upon the record before us, that appellee was properly awarded priority of invention.

The decision of the Board of Appeals is affirmed.

Affirmed.