S. W. FARBER, INC., Plaintiff,

v.

TEXAS INSTRUMENTS, INCORPO-
RATED, Defendant.

Civ. A. No. 2271.

United States District Court
D. Delaware.

Dec. 5, 1962.

Herbert L. Cobin, Wilmington, Del., for plaintiff; Hobart N. Durham (of Morgan, Finnegan, Durham & Pine), Laurence F. Scinto, New York City, of counsel.

C. Edward Duffy (of Logan, Marvel, Duffy & Boggs), Wilmington, Del., for defendant; Samuel M. Mims, Jr. (Texas Instruments Inc.), Dallas, Tex., Town-send M. Gunn (of Texas Instruments Inc.), Attleboro, Mass., Lloyd R. Koenig (of Koenig, Pope, Senniger & Powers), St. Louis, Mo., and Robert F. Davis (of Stevens, Davis, Miller & Mosher), Washington, D. C., of counsel.

STEEL, District Judge.

S. W. Farber, Inc., the plaintiff, sued Texas Instruments, Inc., the defendant, for infringement of U. S. Letters Patent No. 2,926,230 which was issued to plaintiff as assignee of Hoyt K. Foster, the patent applicant. The subject matter of the patent is a detachable temperature regulating connector for an electrically heated device such as a cooking utensil. The combination patent is for the regulating connector itself; the device with which the connector is used is not claimed as a part of the patented combination. The parties have stipulated that a decision with respect to Claim 1 will be dispositive of all other claims.[1]

The plaintiff is incorporated in New York, the defendant in Delaware. Jurisdiction exists under 28 U.S.C. § 1338 (a).

By virtue of Pretrial Order dated November 27, 1961, the issue before the Court is limited to whether Foster was the sole inventor or whether Burch, or two of defendant's employees, Moorhead or Butts, were joint inventors with Foster.[2] At this juncture it is assumed that the patent is in all other respects valid, since all other defenses have been reserved for later determination, if the defense of joint inventorship should fail.

The plaintiff is engaged in the manufacture and sale of cooking utensils of various kinds. The defendant manufactures and sells thermostats through the Spencer Thermostat Division of its subsidiary Metals & Controls. Neither defendant nor its subsidiary manufactures or sells cooking ware.

Sometime in 1954, Foster, plaintiff's chief engineer, recognized the desirability of developing an electrically heated thermostatically controlled frying pan which could be completely immersed in water for washing. This was not possible with frying pans then on the market because the thermostats were in the handles and could not be detached when the pans were washed. Foster conceived the general idea of solving the problem by putting a probe type of thermostat in a detachable electric plug. Under this general conception a portion of the probe would extend from the plug through a hole midway between the electrical contacts of the plug so as to engage the bottom of the pan and sense its temperature. It was Foster's idea that the action of the thermostat in opening and closing the electrical circuit would keep the pan at predetermined temperature.

Foster's conception did not embrace the use of any particular kind of probe thermostat, although there were several on the market. When the "bulb and bellows" probe type of thermostat which he tried appeared to be unsuitable, he began to look for "a cartridge" type; that is, one cylindrical in shape, less than ½ inch in diameter, and not over 3–4 inches long, for use as a thermal unit in the plug.

1. Claim 1 reads:
"A detachable temperature regulating connector for an electrically heated device comprising in combination a housing, a pair of terminals in said housing for frictional engagement with co-operating terminals on said device, a bracket within said housing, an elongated hollow member carried by said bracket and extending from said housing, said member being formed of a material having a given temperature coefficient of expansion, a pair of electrical contact members affixed to said bracket and connected with at least one of said pair of terminals, a flexible member fixed at one end relative to said bracket and elongated member and extending in a direction generally parallel to said elongated member, the free end of said flexible member being coupled to at least one of said contacts to open and close the contacts when deflected, and a tension member formed of a material having a different temperature coefficient of expansion connecting the distal end of said elongated member with said flexible member at a point between the ends thereof whereby variations in temperature will deflect said flexible member to open and close said contacts."

2. Defendant's alternative contention, asserted for the first time after trial, that Milton Farber, vice-president of plaintiff, was a joint inventor with plaintiff, is beyond the issue defined by the Pretrial Order.

On March 31, 1954, Lyndon W. Burch had filed a patent application for a cartridge type thermostat which embodied the "rod and tube" principle.[3] The patent application did not show any specific use to which the thermostat might be put. It simply disclosed a unit which would move in a certain way in response to temperature variation. This application eventuated in Patent No. 2,793,270 which issued to Burch on May 21, 1957.

On October 12, 1954, Burch, having heard from a third party of Foster's desire to obtain a cartridge type thermostat, came to see Foster. Burch showed Foster several models which he had made, and demonstrated them. It was the first time that Foster had seen a cartridge type of thermostat that could be adapted to a removable plug in a cooking utensil, and he thought that it might be what he was looking for. Foster asked Burch about the availability of his thermostat. Burch said that he had already been in contact with Metals & Controls and that it had an option on the thermostat. Foster indicated that he was dubious about utilizing Metals & Controls to make the thermostat because in the past when plaintiff had attempted to work with Metals & Controls, plaintiff had not received a "good reception".

On October 13, 1954 Foster wrote a letter to a law firm, Morgan, Finnegan & Durham, enclosing a "sketch and some explanation" of an electric cooking utensil with removable heat control plug dated October 12, 1954. The letter and enclosure set forth the general idea of a detachable plug thermostat for an electric cooking utensil. The thermostat there disclosed was representative only, in a general way, of several types of thermostats that might be used.[4]

On the same day, Foster built what is sometimes referred to as a mock-up or "bread board" model, of an electrical plug which embodied the Burch thermostat. This was simply an experimental design to find out how good the heat control would be for frying pan usage.

On October 14, Foster tested the model by searing and cooking a pot roast. To bring the heat up to the desired level, it was necessary for Foster to make periodic adjustments of the thermal unit. Foster said that apart from enabling him to test how good heat control the Burch thermostat would give, it was "far from being a satisfactory model. It wasn't what you would consider a commercial model".

At about this same time, Burch saw Ottmar, the Vice President and general manager of Spencer Thermostat Division of Metals & Controls, and told him of his meeting with Foster. Burch asked Ottmar whether the defendant would be interested in manufacturing a thermostat for plaintiff. Ottmar was interested and authorized his people to do whatever development work on the thermostat as was necessary. Prior to this, Burch had orally agreed with Ottmar that defendant could have a license under the Burch patent.

Between October 14 and October 22, Farber and Foster discussed the refinements necessary to commercialize the thermostatic control plug as a detachable temperature regulator for a cooking utensil. They recognized that it was wrong to depend on the plastic plug to house the thermostat and to hold it in

---

3. The manner in which the rod and tube functioned is not particularly relevant.

4. On November 30, 1954, Foster filed a patent application, Serial No. 471,949, upon the basis of the disclosures in his letter to his patent attorneys. That application embodied none of the details of the patent in suit.

On September 22, 1955, Foster filed a second patent application, Serial No. 535,797.

On February 10, 1959, Foster filed a third patent application, Serial No. 792,-387. This had been divided out of Foster's second application, Serial No. 535,-797. It eventuated in the patent in suit, No. 2,926,230 which issued on February 23, 1960.

Foster's first application and the counts of his second application remaining after the filing of the divisional application, are still in the Patent Office.

place, and that a rigid support was needed to keep the probe in alignment with the contacts which opened and closed the electrical circuit and with the adjusting screw. A rigid unitary construction was necessary not only for accuracy of calibration, but to enable the thermal unit to have a small amount of wiggle or play, within the plug. Without the wiggle, it was not possible for the termal unit to accommodate itself to the "warping" movement of the bottom of the pan which occurred when the pan was heated due to its by-metallic construction. Furthermore, since plaintiff contemplated that Leviton Manufacturing Company would supply the plug cord and electrical connector and assemble the thermostatic unit in the plug, Farber and Foster knew that unless the sensing tube and the electrical contacts were rigidly held in a fixed position with relationship to each other, shipment of the thermal unit would entail movement between the parts and would not be practical.

On October 22, 1954, Burch brought Lowell Comee from Metals & Controls to the Farber office to meet Farber and Foster. Foster showed Comee and Burch the mock-up model which he had made on October 13 and stated that he was going to use it as a plug in a device for controlling the heat of a frying pan. Burch asked if he could take the unit back to Metals & Controls so that it could evaluate the unit and see what could be done toward producing one which was commercially practical. With Foster's permission, Comee and Burch took with them the "bread board" model which Foster had built on October 13. Testimony as to other aspects of the meeting is in dispute and will be discussed later.

On November 11, a meeting was held at the Farber plant between Comee, Ottmar, Farber and Foster. Ottmar was a vice president and general manager of Metals & Controls and knew that the plaintiff felt its past experience with the defendant had not been good. Consequently, he devoted himself to attempting to convince Farber that the defendant was the right concern to manufacture the thermal unit for plaintiff. Ottmar said that defendant was building a sample of the thermostat for testing. He and Farber also discussed various business aspects of the matter, costs and so on. Technical discussions took place between Foster and Comee which are discussed in a later portion of the opinion.

On November 17, 1954, Comee and Moorhead, assistant chief engineer of Spencer Thermostat Division, met with Farber and Burch at plaintiff's plant and showed them a thermostat that Metals & Controls had made to see if it would work as plaintiff required. It was shown to them for their criticisms and approval. This model, constructed by Moorhead, was the first physical embodiment of the thermostat which included a bracket interconnecting the probe and electrical contacts so as to create a unitary assembly.

Following this meeting, Butts, another employee of Metals & Controls, made a minor change in the model which Comee and Moorhead had exhibited to Farber and Foster, consisting of a reversal of the position of the contacts.

On December 2, 1954, Moorhead, Butts and Comee visited plaintiff's plant and showed Farber and Foster a thermostat which incorporated Butts' modification. Defendant had built this thermostat into a cord plug which plaintiff had furnished to it. The thermostat was substantially the bread board model which Foster had given to Burch on October 22, except that, unlike the bread board model, it contained a bracket which interconnected the probe thermal element with the switch contacts and adjusting screw and resulted in a unitary assembly of the entire thermostat. At this conference test runs were made with a frying pan which looked very encouraging.

The design of the unit which defendant submitted to plaintiff on December 2, 1954 was substantially the eventual commercial version of the detachable control plug. Claim 1 of the patent in suit reads on this structure.

On February 10, 1955 plaintiff and defendant entered into a contract under which plaintiff agreed to purchase 100,-000 thermostats from defendant during the year 1955 and 150,000 thermostats during the year 1956 on the condition that defendant would manufacture exclusively for plaintiff during these years.

Thereafter thermostats manufactured by defendant were shipped to Leviton Manufacturing Company which supplied complete cord sets and assembled the thermostatic units into the plugs. Leviton then shipped these units to plaintiff which added the knob and decal to the plug. Plaintiff did the final testing. Manufacturing defects began to appear in the thermal unit, and plaintiff finally decided to stop selling thermostats manufactured by defendant and to adopt a substitute made by another manufacturer. At the time, plaintiff had not purchased from defendant either in 1955 or 1956 all of the thermostats which it had agreed to take.

Sometime in 1956, Fred Stern, an employee of the defendant, asked Farber what the plaintiff would do if defendant began to manufacture plug and cord sets like plaintiff's. Farber replied that plaintiff would sue the defendant. When defendant did so the present suit was brought.

■■ A presumption of validity of the Foster patent arose upon its issuance. 35 U.S.C. § 282. This presumption, however, is a weak one since the question of joint inventorship was not before the Patent Office. Cf. Dole Refrigerating Co. v. Americo Contact Plate Freezers, 265 F.2d 627, 629 (3 Cir.1959).

■ 35 U.S.C. § 116 makes it obligatory for a patent to be applied for jointly where the invention claimed is made by one or more persons jointly. If a patent issues upon the application of a person who claims to be the sole inventor and it later appears that the subject matter of the patent was invented jointly by two or more persons, the patent is invalid. Larson v. Crowther, 26 F.2d 780, 789 (8 Cir.1928), cert. den.

278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 560 (1928); Worden v. Fisher, 11 F. 505, 506 (C.C.E.D.Mich.1882); Fox v. Spiegel, 50 F.2d 195 (D.Conn.1931). It is this principle which defendant invokes to invalidate the patent in suit.

Defendant's contention that Burch was a joint inventor is rejected. It is true that, as Farber testified, the Burch thermostat was the heart of Foster's patent. Nevertheless, prior to October 12, 1954 the Burch thermostat had been freely demonstrated and Burch had sold 50 of the units for use on aircraft ground heaters. Burch's disclosure of the thermostat to Foster was not confidential or secret. It was clearly in the prior art when Burch revealed it to Foster.

■■ Furthermore, when Burch visited Foster on October 12, 1954, he did not know why Foster was interested in his thermostat. During the meeting Burch suggested no use for it, although at the meeting he learned that Foster's interest was in finding a thermostat to use in an electrical plug with a frying pan. The problem which Foster was seeking to solve was one which Foster —not Burch—had recognized. The solution was sought by Foster—not Burch. Insofar as the Burch thermostat contributed to the solution, it was Foster— not Burch—who recognized its utility, in combination with other elements, to solve the problem upon which he alone was working when the Burch thermostat came to his attention. Prior to the time when Foster determined that the Burch thermostat might be useful, there had been no colloboration between Burch and him, nor had they been working together toward a common end. These are essential to joint inventorship. Pointer v. Six Wheel Corp., 177 F.2d 153, 157 (9 Cir.1949); McKinnon Chain Co. v. American Chain Co., 268 F. 353, 360 (3 Cir.1920).

■ Furthermore, the fact that Burch was the inventor of the thermostat did not make him a joint inventor of the combination in which the thermostat was but a part. A patent consist-

ing of a combination of elements is, in legal contemplation, a separate and distinct entity from any of its component parts. A person who is the sole inventor of a combination, wholly apart from whether he is an inventor of an element thereof, is entitled to a patent on the combination. Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Co., 340 U.S. 147, 150–153, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Helms Products, Inc. v. Lake Shore Mfg. Co., 227 F.2d 677, 681 (7 Cir.1955); Coleman v. Holly Mfg. Co., 233 F.2d 71, 79 (9 Cir.1956), cert. den. 352 U.S. 952, 77 S.Ct. 326, 1 L.Ed. 2d 243 (1956). A combination patent may be valid even if every element of the combination is old provided that there is invention in the combination as an entirety. General Motors Corp. v. Swan Carburetor Co., 88 F.2d 876 (6 Cir.1937), cert. den. 302 U.S. 691, 58 S.Ct. 49, 82 L.Ed. 534 (1937), reh. den. 302 U.S. 777, 58 S.Ct. 137, 82 L.Ed. 601 (1937).

One further aspect of the matter must be considered. It is admitted by plaintiff that at the time when Foster built the bread board model on October 13 he had not conceived of the invention disclosed by Claim 1[5] and that Foster's cooking experiment on October 14 was not a reduction to practice of the invention.[6] The bracket to which the probe, electrical contacts and adjusting screw are affixed in Claim 1 were missing from the bread board model and had not been conceived of when it was built.[7] The omission of the bracket from the bread board model is the only difference between it and Claim 1.

The bracket was essential to satisfactory operation of the thermostat and is a material element in Claim 1. Defendant argues that the utilization of the bracket was conceived of by either Moorhead or Butts sometime after Burch and Comee met with Foster and Farber on October 22, and that the model of the thermostat which they built and submitted to plaintiff on December 2 (when tested on or about that date) was the first reduction to practice of the invention disclosed in Claim 1. This conception and reduction to practice by Moorhead or Butts, defendant argues, made them joint inventors with Foster.[8]

On the other hand, plaintiff contends that sometime between October 12 and October 22 Foster conceived that a unitary assembly fixing the probe in a rigid relationship with the electrical contacts and adjusting screw was essential to a satisfactory operation of the thermostat and that Farber and Foster disclosed this to Comee and Moorhead when they visited plaintiff's plant on October 22. Plaintiff asserts further that the use of the bracket involved no inventive skill by defendant's employees since the use of the bracket was the usual and normal way to make a unitary thermostatic assembly, and that Foster and Farber had told Moorhead and Comee that such a unitary assembly was necessary. Because of this, plaintiff argues that although the model which defendant built was the first reduction to practice of the invention, it was in legal contemplation a reduction to practice by Foster, since defendant's employees were just "another pair of hands" working for Foster.

On these key issues the evidence is not too satisfactory. On balance, however, it supports a finding that Foster recognized, after his cooking experiment on October 14, 1954 and before he met with Comee and Moorhead on October 22, 1954, that it was necessary for the probe, electrical contacts and adjusting screw to be kept in rigid alignment by means of a unitary assembly in order to obtain accurate calibration, to permit the requisite amount of play of the thermostat

5. Transcript of Argument—October 25, 1962—p. 28.

6. Transcript of Argument—October 25, 1962—p. 23.

7. Whether the bread board model was operative for its intended purpose is im-

material. Admitted, it was not a desirable commercial arrangement.

8. Defendant's alternative contention that Farber was a joint inventor with Foster is outside of the issues defined by the pretrial order. See footnote 2.

in the plug, and to enable the thermal unit to be shipped satisfactorily for assembly in the plug by Leviton. This finding is based upon the testimony of Foster and Farber as to discussions which they had with each other between October 14 and October 22. It is not corroborated by any other witness or by documentary evidence of any kind. While such testimony is, as a rule, somewhat suspect, I find no reason to reject it in this case.

 Despite Foster's conception, his invention was not complete until he had reduced it to practice. This is a settled principle of patent law. Hann v. Venetian Blind Corp., 111 F.2d 455, 458 (9 Cir.1940); Consolidated Vultee Aircraft Corp. v. Maurice A. Garbell, Inc., 204 F.2d 946, 949 (9 Cir.1953), cert. den. 346 U.S. 873, 74 S.Ct. 122, 98 L.Ed. 381 (1953); Corona Cord Tire Co. v. Dovan Chem. Corp., 276 U.S. 358, 383, 48 S. Ct. 380, 72 L.Ed. 610 (1928). A machine is reduced to practice when it is assembled, adjusted and used. E. I. DuPont De Nemours & Co. v. American Cyanamid Co., 120 F.Supp. 697, 701 (D.D.C. 1954); Corona Cord Tire Co. v. Dovan Chem. Corp., supra. To establish reduction to practice of an invention for a mechanical device, the device tested must include all of the elements of the claim in issue. Akers v. Papst, 113 F.2d 136, 139, 27 CCPA 1400 (1940); Greene v. Beidler, 58 F.2d 207, 208 (2 Cir.1932). Compare Daniels v. Permutit Co., 137 F.2d 823 (3 Cir.1943). The model constructed by defendant's employees and exhibited to Foster and Farber on December 2, 1954 constituted the first reduction to practice of the invention asserted in Claim 1. The question is therefore whether this was in legal contemplation a reduction to practice by defendant's employees in their own right, or as "another pair of hands" for Foster.

On October 22, Farber and Foster had their first meeting with representatives of the defendant following Foster's initial meeting with Burch on October 12. Four persons were present: Foster, Farber, Burch and Comee. The net of the testimony of Foster and Farber is that they told Burch and Comee that it would be necessary to construct the thermostat so that the contacts, probe and adjusting screw would be supported as a unit. On the other hand, Burch testified that there was little discussion at the time. When asked whether he received any advice as "how to produce a * * *", he interrupted the question and answered, "Absolutely none, this is a positive statement." However, he testified that he understood from Foster and Farber that plaintiff wanted defendant to manufacture a "complete thermostat," and that a "complete thermostat" would have to "include the bracket and contacts".

At the meeting on November 11, while various business phases of the transaction were being discussed by Farber and Ottmar, Foster had technical discussions with Comee. Foster testified that he told Comee of the manufacturing requirements, and that he pointed out again that the thermostat and contacts would have to be a complete unit so there would be a rigid mounting of the contacts and the probe to eliminate unwanted motion.

At the time when Moorhead built the model which he exhibited to Foster and Farber on November 17, he had not talked to anyone in plaintiff's organization. When he was asked who designed and put the bracket into the model, he testified, "That was my idea". Moorhead said that the information which he used in making the thermostat was obtained from Comee and possibly from Burch, and that, "I remember most of my information came from our representatives that brought the information back from Farber." Moorhead made no claim to have improved upon the device which he had been instructed to build.

Defendant relies heavily upon Foster's deposition to establish that defendant's employees were the first to conceive of the use of the bracket to join the probe, contacts and adjusting screw. In his deposition Foster testified that the bracket and the affixation of the bracket

to the contact members was a contribution of Burch and the Metals & Controls people. Foster said that his contribution went back to the original idea of a probe type thermostat in a frying pan and that the details were someone else's. Shortly before this testimony had been elicited, Foster had been asked whether he or Spencer or Burch had developed the "mechanical details" of the thermostat, to which Foster replied that he assumed that Burch had. The testimony which followed this inquiry, and upon which defendant relies so heavily, could well have been understood by Foster as referring to the "mechanical details" about which he had just been interrogated. When Foster was examined by plaintiff at the trial on the subject of his deposition, he said he considered that the deposition questions had related to the actual physical parts of the thermostat. All things considered, this explanation seems reasonable enough.

There is no proof that either Foster or Farber told defendant's employees that in manufacturing the thermal element they should utilize a bracket to keep the contracts and probe in alignment. Defendant's representatives were told, however, that a unitary assembly of the probe and contacts was essential. The normal and usual way in which to construct the unitary assembly was by means of a bracket. Dr. Fischer, defendant's expert, admitted that it would take considerable thought on his part to make a unitary assembly in any other way. Under the circumstances, the specific design contribution by defendant's employees—the bracket to effect a unitary assembly—did not rise to the height of an inventive contribution. In the light of the instructions they received from Foster, the use of the bracket was a mechanical detail of an obvious kind which any qualified engineer or designer could reasonably be expected to make. This was not enough to establish a joint invention. Alto Company v. Fish Manufacturing Co., 158 F.Supp. 752, 755 (D. N.J.1957), aff'd per curiam 252 F.2d 299 (3 Cir.1958); Adams v. Columbus

Mfg. Co., 180 F.Supp. 921, 929 (M.D. Ga.1960); 1 Walker, Patents (Dellers' Ed.1937) 403.

It has been said that one may be a joint inventor, even though the conception of the entire device may be due to another, if he makes suggestions of a practical value which assist in making the main idea operative, or contributes an independent part of the entire invention which is united with the parts produced by the other and creates the whole. Altoona Publix Theatres, Inc. v. American Tri-Ergon Corporation, 72 F. 2d 53, 56 (3 Cir.1934), rev. on other grounds, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1935). This principle is without application to the case at bar, since no suggestions of practical value were made by employees of defendant save those which were obvious under the instructions which Foster and Farber gave to them.

Cases such as Q-Tips, Inc. v. Johnson & Johnson, 207 F.2d 509, 511 (3 Cir.1953), cert. den. 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954), which hold that in a suit for the infringement of the combination patent, every element claimed is deemed essential and the patentee will not be heard to assert its immateriality, are without relevance here. Plaintiff does not disavow the importance of the bracket to the satisfactory operation of the thermal unit. Its importance is conceded. Plaintiff simply asserts Foster and Farber explained to defendant's employees the necessity for a unitary assembly of the probe and contacts and that the use of a bracket was the normal and obvious way to make it.

Working as they did under instructions which they had received from Foster and Farber in an effort to produce a thermostat which would be satisfactory to plaintiff, defendant's employees were simply "another pair of hands" for Foster. It is not material that plaintiff made no payment to defendant for its development work and that the price of the thermostat did not include as a factor the development costs of defendant.

It follows that neither Burch nor defendant's employees, Moorhead or Butts, was a joint inventor with Foster of the subject matter of Claim 1.

This opinion constitutes the findings of fact and conclusions of law required by F.R.Civ.P. 52(a).