S. W. FARBER, INC., Plaintiff,

v.

TEXAS INSTRUMENTS INCORPO-RATED, Defendant.

Civ. A. No. 2271.

United States District Court
D. Delaware.
May 8, 1964.

1. Count XVI was dismissed at the commencement of the trial.

Herbert L. Cobin, of Coxe, Booker, Walls & Cobin, Wilmington, Del., Hobart N. Durham, of Morgan, Finnegan, Durham & Pine, New York City, and John C. Vassil, New York City, of counsel for plaintiff.

C. Edward Duffy, Wilmington, Del., Robert F. Davis, of Stevens, Davis, Miller & Mosher, Washington, D. C., Townsend M. Gunn, Attleboro, Mass., Lloyd R. Koenig, St. Louis, Mo., and Harold Levine, Dallas, Tex., of counsel for defendant.

STEEL, District Judge.

S. W. Farber, Inc., the plaintiff, sued Texas Instruments Incorporated, the defendant, for infringement of United States Letters Patent No. 2,926,230 issued to plaintiff as assignee of Hoyt K. Foster, the patent applicant. The patent states that it pertains to an improved detachable electrical connector and temperature regulator for electrically controlled heating devices. Defendant has denied validity but admitted infringement if the patent is valid. The thermostatic control plugs which defendant has manufactured and sold to West Bend Company, Mirro Aluminum Company and McGraw Electric Company are illustrative of the accused devices.

Defendant has filed two counterclaims. The first seeks a declaratory judgment adjudging the patent to be invalid, or alternatively, that the invention claimed was made in whole or in part by persons associated with defendant or its predecessor. The latter issue was tried separately and determined adversely to defendant. S. W. Farber, Inc., v. Texas Instruments Incorporated, 211 F.Supp. 686 (D.Del.1962) [1]. The second counterclaim is for unfair competition.

Much of the background of the controversy is disclosed in the opinion at 211 F.Supp. 686 and the Findings of Fact and Conclusions of Law stated there are incorporated herein by reference. By stipulation the record in the earlier trial is part of the present record.

## JURISDICTION

The complaint seeks relief under the patent laws and jurisdiction exists under 28 U.S.C. § 1338(a). Counterclaim 1 arises out of an actual controversy between the parties as to the charge of infringement made by plaintiff against defendant and defendant's contention that it has rights to the patent in suit which plaintiff denies. Jurisdiction of counterclaim 1 exists under 28 U.S.C. §§ 2201–2202. Counterclaim 2 alleges a claim for unfair competition which has been joined with a substantial and related claim under the patent laws. Jurisdiction over counterclaim 2 exists under 28 U.S.C. § 1338(b).

## THE VALIDITY ISSUE

The parties have agreed that claims 2 and 4 are typical or representative, that if claims 2 and 4 are valid, all claims are valid; if claims 2 and 4 are invalid, all claims are invalid, and if either claim 2 or 4 is valid and the other invalid, the remaining claims are not adjudicated.

While a number of defenses have been pleaded, only that asserted under 35 U.S.C. § 103 need be dealt with.[2] It provides that although an alleged invention is not identically disclosed or described in the prior art specified in Section 102 of Title 35, a patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art.

---

1. Defendant has reserved the right to appeal from this decision.

2. Defendant sought leave to plead the defenses of unclean hands, patent misuse and anti-trust violation. Leave was denied because their assertion was not timely.

In early 1954 two thermostatically controlled fry pans were put on the market One was manufactured by Sunbeam and the other by Presto. The Presto pan could not be immersed in water for washing. That manufactured by Sunbeam could be immersed only up to the temperature dial on the handle and carried a notice to that effect. It had the thermostat permanently secured in the handle, and it could not be detached.

Sometime in 1954 Foster, the chief engineer of the plaintiff, recognized the desirability of developing an electrically heated, thermostatically-controlled fry pan which could be completely immersed for washing without damaging the pan. This was not possible with any of the electrified fry pans then being marketed.

With complete immersibility as his goal, Foster, prior to October 12, 1954, conceived the general idea of putting a probe type of thermostat in an electric plug which could be detached from the pan when it was washed. Under this general concept a portion of the probe would extend from the plug through a hole midway between the receptacle contacts of the plug and enter a recess in the bottom of the pan so as to engage the bottom of the pan and sense its temperature when the plug and pan were in operational relationship. It was Foster's idea that when the electric current heated the pan above the desired temperature the thermostat would open the circuit, and when the temperature of the pan fell below the desired temperature the thermostat would close the circuit, thus enabling the heat of the pan to be maintained at a relatively uniform pre-determined temperature.

On November 30, 1954 Foster filed a patent application, Serial No. 471,949, embodying this concept. It eventuated in patent No. 3,095,498. The 498 patent is not in suit, for it did not issue un-

til June 25, 1963 after the present action was begun. The 498 patent is for a combination consisting of an electrical cooking utensil and a detachable thermostat housed in an electrical plug. This initial concept did not embrace the use of any particular kind of probe thermostat, although there were several types on the market. The specifications provided that the thermostat could be:

"operated in any conventional manner such as by means of a bi-metal element or an expansible fluid and bellows and is preferably of the "on-off" type with the adjustment of the device being effected by means of a knob * * * ".

As stated, the 230 patent relates to an "improved" detachable electrical connector and temperature regulator for electrically controlled heating devices, such as a cooking utensil. Unlike the 498 patent, the 230 patent does not claim the device with which the connector is to be used. The 230 patent is merely for a specific type of probe thermostat consisting of a combination of elements housed in an electrical plug. It is intended for use as a substitute for the unspecified type of probe thermostat disclosed in the 498 patent.

The subject matter disclosed and claimed in the 230 patent was conceived by Foster sometime after his cooking experiment on October 14, 1954 and before October 22, 1954. It was reduced to practice on December 2, 1954. On that date the invention of the 230 patent was complete. S. W. Farber, Inc. v. Texas Instruments Incorporated, supra, 211 F. Supp. p. 692. Foster filed his original application, Serial No. 535,797, on September 22, 1955, and this eventuated in the 230 patent on February 23, 1960.

Originally, Foster had in mind using a probe thermostat of the bulb and bellows type in his control plug.[3] Later, he be-

---

3. A bulb and bellows thermostat consists of a bulb, a pair of bellows, and a thin tube which connects the bulb and bellows. The bulb and bellows are usually metallic. What the tube is made of is not disclosed. The bulb, tube and bellows are airtight and contain a gas of some type. The bulb is immersed in or placed in contact with the material the temperature of which is to be controlled. When the material is heated the gas expands, and when the material cools the gas contracts. This

gan looking for a probe thermostat of the cartridge type. There were several of these on the market.[4] The first time that Foster saw one which was sufficiently small to be adapted to a removable plug for use with a fry pan was on October 12, 1954 when Lyndon W. Burch visited plaintiff's plant and showed Foster a cartridge thermostat embodying a "rod and tube" thermal element which Burch had developed.

The 230 patent carried forward Foster's original idea disclosed in the 498 patent, by substituting a unitary thermostatic switch embodying the thermal element which Burch showed Foster on October 12, 1954 in place of the schematic generalized showing of a thermostat found in the 498 patent.

The thermal element disclosed by the 230 patent was the subject of an application, Serial No. 420,064 which Burch had filed on March 31, 1954. This even-

tuated in patent No. 2,793,270 which issued to Burch on May 21, 1957.

The critical question under 35 U.S.C. § 103 is not whether the alleged invention in the 230 patent is identically disclosed or described in the prior art specified in 35 U.S.C. § 102. The issue is whether the differences between the subject matter of the 230 patent and the § 102 prior art are such that the subject matter of the 230 patent as a whole would have been obvious on December 22, 1954 to anyone having ordinary skill in the art to which its subject matter pertains.

When Foster faced the problem of developing a detachable temperature regulating connector to be used with electrically heated devices, he was chargeable with knowledge of the following prior art patents: Gaunt British patent No. 599,224 for which complete specification was accepted on March 8, 1948, Ross United States patent No. 1,431,542, which issued on October 10, 1922, Norton U. S.

expansion and contraction causes an increase or decrease in pressure which is transmitted through the tube to the bellows which are thereby caused to open and close. The end of the bellows outside of the tube are attached to an electrical contact. When the bellows open, the circuit is broken; when the bellows close, the circuit is closed. In this way the heat which is electrically generated can be maintained at a pre-determined temperature.

4. One type of cartridge thermostat is composed of a piece of hollow tubing closed at one end. Enclosed within the tubing is a bi-metallic thermal element consisting of two flat strips of different metals bonded to each other, which expand at different rates upon being subjected to heat. One end of the bi-metallic element is mounted within the tube. The other end extends out of the open end of the tube and is connected to an electrical contact. Upon the application of heat to the tube one strip in the thermal element expands at greater rate than the other. This effect causes a mechanical bending of the bi-metal element, thereby creating lateral movement at the end of the element affixed to the electrical contact. This movement opens the contact. Conversely, when the heat is removed the metals contract at different rates causing an unbending, lateral movement in the opposite direction of the bi-metal element and a closing of the contact.

Another kind of cartridge thermostat is the "rod and tube" type. This consists of a hollow tube closed at one end. The tube is made of a high expansion metal. A rod inside the tube is of low expansion metal and one end thereof is fastened in the tube to the closed end of the tube. The other end of the rod is fastened to a flexible narrow extension of the wall of the tube at its open end. When heat is applied to the cartridge the tube expands longitudinally at a greater rate than the rod, thereby causing the flexible extension on the tube to be pulled toward the center of the tube. The extension is fastened to an electrical contact which is caused to be opened by the movement of the extension. When the heat is removed the tube contracts at a greater rate than the rod and the extension is pushed in the opposite direction, closing the contact. Thermostats employing the bi-metal principle were used for breaking electrical circuits long before 1941 for a wide variety of electrical devices such as flat irons, coffee cookers, bread toasters, etc. Cuno Engineering Corp., v. Automatic Devices Corp., 314 U. S. 84, 88, 62 S.Ct. 37, 86 L.Ed. 58 (1941).

patent No. 2,024,471 which issued on December 17, 1935.[5]

Each of these three patents disclosed, as does the 230 patent, a detachable temperature controlling connector unit for an electrically heated device having spaced terminals, the connector unit comprising in combination a housing and a pair of spaced terminals for cooperating with the terminals of the device to be heated for applying electrical energy thereto. Each of the three patents contains a thermostat of some type.

Claim 2 of the 230 patent reads:

*"A detachable temperature controlling connector unit for an electrically heated device, having space terminals, said connector unit comprising in combination a housing, a pair of space terminals for cooperating with the said first terminals for applying electrical energy thereto,* a support mounted within said housing and carrying a tubular member extending outwardly from said housing in relation to the terminals thereof, said tubular member being adapted to be positioned in heat transfer relation with the said device when its said terminals are positioned in cooperation with the first terminals on said device, a pair of resilient contact carrying members on said support and connected to control the application of energy to said terminals, adjustable means for fixing the position of one of said contact carrying members, and means within said tubular member having its inner end in engagement with the distal end of the tubular member, the outer end of the last said means coupled in motion amplifying relationship to the other of said contact carrying members to actuate the contact carrying members in response to temperature changes sensed by said tubular member, the tem-perature at which said actuation of the contact carrying members takes place being determined by the position of one contact carrying member."[6]

Kelley, who testified as an expert for plaintiff, identified the emphasized portions of claim 2 as described in the Ross Patent No. 1,431,542.

Claim 4 of the 230 patent reads:

*"A detachable temperature regulating and power-supplying connector for an electrically heated device, comprising in combination an elongated hollow housing, having an end-wall part, including at least three spaced openings, a pair of terminals in said housing aligned with two of said openings,* a metallic bracket within said housing, an elongated hollow metallic probe fixedly secured to said bracket and extending through the third of said openings and from the housing, a pair of cooperating contacts within said housing, and affixed in insulating relationship to said bracket, an elongated member within said probe with one end of said member engaging the distal end of said probe, and the other end of said member in coupled, motion amplified relationship with said contacts to open and close them in accordance with changes in temperature of said probe, a power supply cable attached to said housing and connected to one of said housing terminals and one of said contacts and a connection between the other of said contacts and the other of said housing terminals."

Kelley stated that the emphasized portion of claim 4 described the disclosure of the Ross Patent No. 1,431,542.

The emphasized portions of claims 2 and 4 make no reference to a thermostat. The language of the claims which is not emphasized describes the thermosta-

---

5. The question of whether British patent No. 725,341 or Belgian patent No. 518,320 were in the prior art on December 12, 1954 need not be decided.

6. Emphasis supplied unless otherwise indicated.

tic element of the claims. Obviously, it is not the thermostat which Ross disclosed.[7] The langauge which is not emphasized does, however, describe the "rod and tube" thermal actuator of the then pending Burch patent application, plus a bracket (mounted in the plug) which connects the thermal actuator with a pair of resilient contact carrying members and a screw to adjust the position of one of the members.

Prior to December 2, 1954, when Foster completed his invention, the Burch thermal actuator disclosed in Burch's application filed on March 31, 1954, was part of the prior art, since Burch's application antedated Foster's, and Burch's patent was issued prior to Foster's 230 patent. Detrola Corp. v. Hazeltine Corp., 313 U.S. 259, 265, 269, 61 S.Ct. 948, 85 L.Ed. 1319 (1940).[8] In addition, Burch had actually exhibited his thermal actuator to Foster on October 12, 1954. This was not done in a confidence, nor with the exaction of pledges of secrecy from Foster.

There was nothing inventive about using the Burch thermal actuator to thermostatically control the opening and closing of an electric circuit. Prior to October 12, 1954, Burch had shown a thermostat using his thermal actuator to a manufacturer's representative in Connecticut, and a thermostat employing the Burch actuator had been used commercially on an aircraft ground heater. Indeed, when Burch met with Foster on October 12, he showed him a thermostat (DX 29) which employed his thermal actuator, although it was not in an electrical plug.[8-a] So that a thermostat which embodied the Burch actuator was also in the prior art before October 12, 1954.

To give the Burch thermal element the utility which Foster disclosed in the 230 patent, it was necessary to do two things: first, connect the probe, switch contacts, and a screw for adjusting the contacts by a metallic bracket so as to hold the three elements together rigidly as a unit, and second, install the assembly (probe, contacts, and adjusting screw so connected) in an electric plug having two electrical receptacles with a hole between through which the probe extended to perform its heat sensing function when in contact with the bottom of the fry pan.

The physical accomplishment of these two steps was carried out by employees and associates of the defendant working as "another pair of hands" for Foster and under his direction. See S. W. Farber, Inc., v. Texas Instruments, Incorporated, supra, 211 F.Supp. 693. The use of a bracket to render the assembly unitary so that the probe, contacts and adjusting screw were joined together in a fixed and rigid relationship with each other, was not inventive. It was simply the mechanical way to accomplish the desired result and would have been readily perceptible to any worker skilled in the field who was told to combine the three elements into a single rigid assembly. S. W. Farber, Inc., v. Texas Instruments Incorporated, supra, 211 F.Supp. p. 693. Nor did the general idea that the assembly would have to be unitary, which Foster imparted to the employees and associates of defendant, rise to the height of invention. If the thermostat were to have accurate calibration, the amount of wiggle or play in the plug required because of the expansion and contraction of the fry pan when in contact with the probe, and be in condition to be shipped to the Leviton Manu-

7. The Ross patent disclosed a metallic thermostat composed of two thin strips of metal having different coefficients of expansion connected to a metallic conducting pin designed to project outwardly through the middle hole of the connector and to abut against, or enter a suitable recess in the utensil, the heat of which was to be controlled.

8. Although this decision antedated the 1952 Patent Act, the same rule has been applied under the 1952 Act. Hazeltine Research, Inc. v. Ladd, 226 F.Supp. 459 (D. C.D.C.1964).

8-a. Whether Burch also showed Foster DX 44 and 46 need not be determined.

facturing Company (as was planned) for installation in the plug, it was necessary for the probe, contacts, and adjusting screw to be held together rigidly as a unit. This would have been obvious to anyone having ordinary skill in the art. The concept of installing the thermostat in the plug was not inventive, for that idea was revealed not only in Ross but also in the Gaunt British Patent No. 599,224 and Norton U.S. Patent No. 2,004,471.

Kelley pointed to many deficiencies in the Ross patent which he said made the operation of its structure impractical. The "most glaring ones" he said, were the shock hazards and possibility of short circuits. Kelley acknowledged, however, that these deficiencies would be recognized by a person skilled in the art and could be readily corrected. Kelley also pointed out that the erratic ambient temperature variations inherent in the Ross structure would cause it to operate unsatisfactorily. But this defect, and others which Kelley emphasized to a lesser degree, could all be remedied by substituting the Burch thermal probe in unitary assembly with the contact switches and adjusting screw, for the metallic conducting pin and thermostatic arrangement disclosed by Ross.

Plaintiff argues that it is not permissible for an infringer to go to the prior art and defeat a patent by selecting various elements thereof and bringing them together and saying that the aggregation anticipates invention of the patent. Atlantic Refining Co. v. James B. Berry Sons Co., 106 F.2d 644, 650 (3rd Cir. 1938) so holds. But here the defense under examination is not anticipation dealt with by § 102; the defense is obviousness under § 103.

■ Plaintiff concedes that all of the structural elements found in claims 2 and 4 of the 230 patent were known before Foster conceived of his alleged invention. The conjunction or concert of known elements must contribute something. Only when the whole in some way exceeds the sum of its parts is the accumulation of

old devices patentable. This is established doctrine. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). There, a patent consisting of a combination of mechanical elements was held to be invalid because the combination had not resulted "in any unusual or surprising consequences," 340 U.S. at 152, 71 S.Ct. at 130. The same thing is true of the combination of elements disclosed in claims 2 and 4 of the 230 patent. The Burch thermal element works in precisely the same manner regardless of whether it is in or out of the structure of the 230 patent. It would also work in the same way if it were in the Ross patent.

■ It may be conceded that the function performed by the structure disclosed in the 230 patent was "new and useful". This, however, is not enough to make it patentable. Under 35 U.S.C. § 101 "invention" or "discovery" is a prerequisite to patentability. See Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58 (1941) decided under 35 U.S.C. § 31; R.S. § 4886, the forerunner of § 101 of 35 U.S.C. in Chemical Construction Corp. v. Jones & Laughlin Steel Corporation, 311 F.2d 367, 371 (3rd Cir. 1962), the Court stated that the Great Atlantic & Pacific Tea Co., Cuno Engineering Corporation, and other Supreme Court cases had established a "high standard" of inventiveness which was required to warrant the issuance of a patent. Claims 2 and 4 fail to meet that standard.

■ Plaintiff points out that both the Ross and Burch patents were cited in the Patent Office against the 230 patent but nevertheless the subject matter of 230 was held to be patentable. Admittedly, this enhances the presumption of validity which arose when the patent issued. Hartford National Bank & Trust Co. v. E. F. Drew & Co., Inc., 133 F.Supp. 648, 652 (D.Del.1955), aff'd, 237 F.2d 594 (3rd Cir. 1956). But this circumstance is not of controlling significance. The standard of inventiveness employed by the patent office is far below that

applied by the courts. Picard v. United Aircraft Corporation, 128 F.2d 632, 641 (2nd Cir. 1942), cert. den., 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524 (1942). The category of patented unpatentables has been held to be large. Packwood v. Briggs & Stratton Corp., 195 F.2d 971, 974 (3rd Cir. 1952), cert. den. 344 U.S. 844, 73 S.Ct. 61, 97 L.Ed. 657 (1952).

■ Plaintiff likewise stresses the fact that the structure disclosed and claimed by Foster has come into widespread use, been adapted by industry, and achieved commercial success. Commercial success, however, without invention will not make patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. p. 153, 71 S.Ct. 127.

■ In view of the Ross patent and the Burch thermal switch, the difference between claims 2 and 4 of Foster's 230 patent and the prior art on December 2, 1954 were such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which the subject matter of the patent 230 pertains. Invention is lacking. Patent 230 is, therefore, invalid, and the complaint will be dismissed. A declaratory judgment will be entered under Counterclaim 1 adjudging the 230 patent to be invalid.

## UNFAIR COMPETITION

Defendant's counterclaim for unfair competition is based upon the contention that plaintiff (i) advertised its plug as patented almost five years before the 230 patent issued, (ii) obtained a patent for a device which was not patentable, and (iii) threatened customers of defendant with infringement suits so as to make it necessary for the defendant to indemnify them.

■ Preliminarily, a word should be said about the law to be applied. The unfair competition claims have their source in state law and would appear to require the application of state law even though they arise in litigation in-

volving a claim of patent infringement based upon federal law. C.f., Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 540–541, N.1 (2nd Cir. 1956); Blisscraft v. United Plastics Company, 294 F.2d 694, 697 (2nd Cir. 1961). Although there is evidence where some of the alleged acts of unfair competition took place, such as the states in which defendant's customers were threatened with infringement suits by plaintiff, neither of the parties has raised any question about whether federal or state law should be applied or has asserted that the application of the law of one state as against that of another brings about a different result. Under the circumstances, reliance upon the "indeterminate general law" is warranted. Maternally Yours v. Your Maternity Shop, supra, 234 F.2d p. 540, N.1; American Safety Table Co. v. Schreiber, 269 F.2d 255, 271 (2nd Cir.), cert. den. 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959).

It is conceded that plaintiff distributed a circular to dealers in October of 1955 which depicted its "automatic electric fry pan" and said:

> "EXCLUSIVE! *Thermostatic Control* IN THE PLUG!
>
> "This new amazing, patented Farberware feature means you can *completely* immerse the fry pan in water for safer, easier, quicker cleaning." [9]

About 40,000 of these circulars were printed, although the precise number which plaintiff distributed is not disclosed.

■ The claim that the Foster plug was patented was, of course, untrue inasmuch as the 230 patent did not issue until February 23, 1960. An announcement that a device is protected by a patent when in fact it is not does not amount to unfair competition unless the announcement was intentional. Deering, Milliken & Co. v. Temp-Resisto Corporation, 160 F.Supp. 463, 485 fn. 11 (S.D.N.Y.1958); mod. on other grounds, 274 F.2d 626 (2nd Cir. 1960).

---

9. Emphasis appears in the circular.

 Circulars distributed in late 1955 or early 1956 made no claim that the plugs were patented. None of the booklets which accompanied the appliances distributed from 1955 on indicated that the plugs were protected by patents. The control plugs which plaintiff sold in 1955 and 1956 were marked, quite properly, "patent pending." An advertisement by plaintiff in LIFE in the spring of 1956 as well as a reproduction thereof which plaintiff supplied to its dealers for display with its merchandise, likewise stated that a patent was pending on the control plug. Plaintiff was not aware of its erroneous claim that its plug was patented until defendant called it to plaintiff's attention when Foster's deposition was taken on December 2, 1960. From this combination of circumstances, it is clear that the claim that the plug was patented, which plaintiff made in a single batch of circulars distributed in October 1955, was inadvertent and not occasioned by any deliberate intention to gain an unfair advantage over defendant or other competitors.

 Within a month after the 230 patent issued, plaintiff wrote certain of its competitors and charged that devices which they were selling infringed plaintiff's patent rights. This was not an unfair competitive practice. The patent, having issued, was presumptively valid. 35 U.S.C. § 282. The very purpose of the patent was to enable plaintiff to prevent non-permissive use of structures covered by it. The notices which plaintiff sent were in furtherance of this purpose.

 It is not significant that plaintiff threatened to sue customers of the defendant for infringement and that this compelled defendant to indemify its customers against damages they might sustain as a result of such actions. At the time, the patent was presumptively valid. There is no evidence that plaintiff's infringement notices were sent in bad faith for the sole purpose of destroying the defendant's business. In the absence of such proof the giving of the infringement notices was not wrongful. A. B. Farquhar Co. v. National Harrow Co., 102 F. 714, 715, 49 L.R.A. 755 (3rd Cir. 1900); Cheney Co. v. Cunningham, 37 F.Supp. 224, 230 (W.D.Pa.1941); aff'd 127 F.2d 294 (3rd Cir. 1942).

Counterclaim 2 based upon plaintiff's alleged unfair competition will be dismissed.

 The case is not such an exceptional one as to justify an award of attorneys fees to the defendant under 35 U.S.C. § 285.