John TULLY et al., Plaintiffs,

v.

MOTT SUPERMARKETS, INC., et al.,
Defendants.

Civ. A. No. 835–71.

United States District Court,
D. New Jersey.

Feb. 2, 1972.

837

Robinson, Wayne & Greenberg, by Donald A. Robinson, Robert A. Wayne, W. Hunt Dumont, Newark, N. J., for plaintiffs.

Riker, Danzig, Scherer & Brown, by Everett M. Scherer, Newark, N. J., Wilentz, Goldman & Spitzer by Frederick K. Becker, Perth Amboy, N. J., for director-defendants.

Hughes, McElroy, Connell, Foley & Geiser by Adrian M. Foley, Jr., Kenneth F. Kunzman, Newark, N. J., for stockholder-defendants.

## OPINION

WHIPPLE, District Judge:

This matter is before the Court pursuant to what I have styled to be plaintiffs' application for a preliminary injunction. The complaint alleges an illegal and secret conspiracy to usurp voting control of Wakefern Corporation. Plaintiffs predicate their right to relief upon the Federal Securities laws,[1] par-

---

1. Plaintiffs have alleged violations of Section 10(b) of the 1934 Exchange Act, 15 U.S.C. § 78j as well as Section 5 of the Securities Act of 1933.

ticularly Rule 10b–5, 17 C.F.R. 240.10b–5, the New Jersey Securities Act, N.J. S.A. 49:3–47 et seq., wrongful interference with existing contractual relations, and breach of fiduciary duties.

This motion seeks an order, pending final determination on the merits, invalidating the purchase of certain control stock, declaring invalid an election of directors and officers, ordering a new election of directors, at which election the stock allegedly acquired illegally would not be voted, and declaring invalid a resolution accelerating plaintiffs' withdrawal from Wakefern.

### FACTUAL BACKGROUND

Wakefern Food Corporation is a New Jersey Corporation engaged in the business of warehousing, buying, distributing and selling general produce and food products to its stockholders. Wakefern stockholders own and operate approximately 185 supermarkets in New Jersey, New York, Pennsylvania, Connecticut and Massachusetts. Most of these supermarkets are served by Wakefern and operate under the "Shop-Rite" name. All of them sell the "Shop-Rite" brand merchandise. As a result of the economies of size inherent in Wakefern purchasing power, the stockholders pay less for their goods than if they were to purchase them on their own. Additionally, the stockholders receive the benefit of using numerous grocery and non-food items bearing the "Shop-Rite" label. It is undisputed that all of the plaintiffs rely heavily on Wakefern for their profitable business existence.

This case is essentially a story of former "ins" who are now "outs" and, by this motion, are seeking to become "ins" once again. Plaintiffs Tully, Henry, Saker and Foodarama own and operate numerous supermarkets, drug stores and gasoline stations and were among the originators and early stockholders of Wakefern. As of April 8, 1971 they held 250 Class A shares out of a total of 333⅓ which were issued and outstanding. The Class A is the most valuable stock because its owners, pursuant to the

Certificate of Incorporation and bylaws, have the right to nominate and elect 12 of the 20 man Board of Directors. With this power plaintiffs controlled the destiny of Wakefern because an affirmative vote of only 12 members is required to effectuate most corporate action.

The defendants are in two categories: (a) 14 Directors of Wakefern, and (b) Stockholders of Wakefern. All defendants prior to April 8, 1971 owned Class C stock, but none owned Class A stock. With their Class C stock they had the collective right to elect the remaining eight members to the Board of Directors.

In 1967 a large bloc of Wakefern, which now operates under the "Pathmark" name, withdrew. As part of its orderly withdrawal the "Pathmark" group sold its 666⅔ shares of Class A stock to Wakefern which shares ultimately reverted to Wakefern's Treasury. The plaintiffs allege that the director-defendants, who had majority control of the Board, sought a means of shifting the voting control of Wakefern by passing a resolution offering these 666⅔ shares of Class A Treasury stock to themselves and other Class B and C stockholders. A touch of irony is added to this drama since it was plaintiffs who elected several defendants to the Board and were, therefore, singularly responsible for vesting control in defendants, thus unwittingly facilitating their own dilemma. It is the purchase of this stock, pursuant to the resolution, which plaintiffs contend was fraudulent and in breach of certain contractual and fiduciary duties, thus entitling them to the relief requested. The destiny of Wakefern is presently in the hands of the defendants because the stock gives them voting control and, thereby, a power of self-perpetuation which they would not have otherwise had.

### JURISDICTION

The defendants have levelled a multi-pronged attack against the jurisdiction of this Court. These contentions will be treated *seriatim*.

### Rule 10b–5 Jurisdiction

Plaintiffs contend that this Court has exclusive jurisdiction by virtue of the provisions of Section 10(b) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78aa, and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated by the Securities and Exchange Commission. Defendants contend that the requisites of a 10b–5 claim are not present, thus, depriving this Court of subject matter jurisdiction.

The thrust of defendants' jurisdictional argument seeks to revive the spectre of the *Birnbaum* buyer-seller doctrine[2] at a point in time when both courts and legal scholars are seeking to bury it. Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). They suggest that because plaintiffs were neither buyers nor sellers with respect to the stock purchase in question they are without standing to sue under Rule 10b–5. Before proceeding to deal with each contention raised by defendants, there is a general principle which militates against recognition and acceptance of the *Birnbaum* rule.

The limitation on standing to sue which defendants seek to impose is nowhere to be found in the language of either Section 10b or Rule 10b–5.[3] To imply such a requirement ignores the recent edict by the Supreme Court mandating a flexible as opposed to a technical or restrictive construction of the Rule. Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Company, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *accord*, Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Defendants' position, furthermore, is directly opposed to the present trend in the law. Rather than broadly construing Rule 10b–5 so as to expand its domain, defendants read into the Rule language which is not present so as to limit its application. Disdain for this approach was heralded by Judge Wortendyke in Bound Brook Water Company v. Jaffe, 284 F.Supp. 702, 708 (D.N.J.1968), when he stated:

"By the same token, the trend of recent decisions indicates that the Court should not preclude a plaintiff from seeking relief under Rule 10b–5 merely because he was not, in the ordinary sense, a purchaser or seller of securities. Such a limitation on standing to sue is not explicitly contained in either Section 10(b) of the Act or in its implementng Rule. The question of standing to sue must be determined in the light of the statutory language invoked, the legislative history of that statute, the case law development surrounding that statute and, most importantly of all, the facts and circumstances surrounding the particular claim presented."

---

2. This doctrine requires the plaintiff to be an actual buyer or seller of securities in order to state a claim under 10b–5.

3. Section 10b of the Securities Exchange Act of 1934 states:

 "To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

 Rule 10b–5 states:

 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

In light of the foregoing, this Court will look with a doubting eye at any effort to resurrect the *Birnbaum* doctrine.

■ Defendants' initial and principal argument is that a buyer or seller must be present where injunctive relief of a retrospective nature is sought.[4] To support their contention defendants evoke this Circuit's recent opinion in Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), and, in the alternative, the absence of any 10b–5 case granting retrospective injunctive relief without the presence of a buyer or seller.

Defendants have apparently confused subject matter jurisdiction with the notion of remedy. They argue that while *Kahan* has discarded the purchaser-seller requirement, its holding is limited strictly to situations where prospective injunctive relief is sought. In this Court's opinion, the abandonment of the purchaser-seller distinction in *Kahan* turns not on the nature of the injunctive remedy sought but rather upon the showing of a causal connection between the violations alleged and plaintiff's loss. As the Court stated:

> "Neither the language of § 10(b) and Rule 10b–5 nor the policy they were designed to effectuate mandate adherence to a strict purchaser-seller requirement so as to preclude suits for relief if a plaintiff can establish a causal connection between the violations alleged and plaintiff's loss." (424 F.2d at 173). *See*, Rekant v. Desser, 425 F.2d 872, 881 (5th Cir. 1970).[5]

This Court, as it will subsequently elaborate upon, believes that such a "causal connection" exists.

As to defendants' alternative attack, this Court's synthesis of cases indicates that a purchaser-seller is not required even where the relief sought seeks to undo a completed transaction. Defendants strenuously argue that Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L. Ed.2d 50 (1970)[6] is not pertinent because a seller, albeit forced, existed. This Court does not limit the impact of *Crane* to the "forced seller" theory.

In Kahan v. Rosenstiel, supra, 424 F. 2d at 171–73, the Court cited *Crane* with approval and refused to restrict its holding to the "forced seller" concept. This Court agrees with *Kahan's* interpretation of *Crane*. Although portions of the *Crane* opinion, taken out of context, support the "forced seller" theory, the following remarks illustrate the predominance of the "causal connection" approach:

> "Standard's failure to disclose its manipulation operated as a fraud or deceit on Crane in connection with the

4. The relief requested by plaintiffs involves the undoing of several completed transactions and is, therefore, primarily retrospective in nature.

5. *Rekant* noted that the distinguishing feature in purchaser-seller damage actions, where the distinction is still drawn, is not so much the relief sought but rather the absence of a casual connection in damage suits between the fraud and the injury.

6. Plaintiff, a tender-offeror, alleged that a third company, Standard, who had itself proposed a merger with the target company, Air Brake had "painted the tape" in Air Brake so as to create a dramatic rise in market price and thereby deter Air Brake shareholders from tendering to Crane. On the day Crane's tender-offer was to expire, Standard purchased 170 shares of Air Brake on the New York Exchange at an average of $49.50 per share and secretly sold 100,000 shares off the market and 20,000 shares on the market at a negotiated price to third parties averaging $44.50 per share. This resulted in an apparent loss of more than $500,000 on its purchases and sales for the day. The Crane tender-offer was defeated; the Standard-Air Brake merger was completed whereby Crane's shares of Air Brake were exchanged for shares of a new Standard convertible preferred; and Crane sold most of these shares under threat of a divestiture action to be brought by Standard under the antitrust laws. In reversing, the Circuit held that Standard, in concealing from the public, particularly the Air Brake stockholders, the true situation as to the market price, had violated §§ 9(a) (2) and § 10(b) of the Exchange Act.

purchase and sale of securities, *creating a right to relief in Crane quite apart from Crane's rights as a forced seller under section 9(a) (2)*." (419 F.2d at 795–796) (Emphasis added).

The Court went on to say:

"When securities are subject to trading dominated by an insider such as Standard, there is an obligation to disclose material information to the investing public, *and this duty gives rise to liability under 10b–5 to third persons who, as a result of the deception practiced upon the public, are prevented from entering into securities transactions with members of the public.*" (419 F.2d at 796) (Emphasis added).

In light of the foregoing, *Crane* has precedential value as a non-buyer—non-seller case.

■ Viewing *Crane* in this context, the spectrum of relief intimated by Judge Smith is of paramount significance. He stated:

"Without limitation, these remedies may include damages, if any, prospective injunctive relief, *as well as appropriate retrospective relief, notwithstanding the consummation of the merger * * *. Consummation of the transaction cannot be allowed to preclude any relief for violations of the securities laws.*" (419 F.2d at 803–804) (Emphasis added.)[7]

Accordingly, this Court holds that the nature of the injunctive relief sought in the absence or presence of a buyer or seller is not determinative of federal jurisdiction under Rule 10b–5. Instead, federal jurisdiction hinges on the existence of a causal relationship between fraud in connection with the purchase or sale of securities and plaintiff's loss. *See*, Mutual Shares Corp. v. Genesco Inc., 384 F.2d 540, 547 (2d Cir. 1967).

■ The second jurisdictional contention raised by defendants is that a buyer-seller requirement must exist where the stock is not traded in the public securities market.[8] Defendants cite no law to support their position nor do they even offer an appropriate rationale. Accordingly, this Court rejects such a restrictive interpretation of Rule 10b–5.

From its inception Rule 10b–5 was applied, without question, to closed transactions. In Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946), the Court applied 10b–5 to a four shareholder corporation where two of the stockholders had bought out the other two. *See also*, Schine v. Schine, 250 F.Supp. 822 (S.D.N.Y.1966), appeal dismissed, 367 F.2d 685 (2d Cir. 1966); Dauphin Corp. v. Redwall Corporation, 201 F. Supp. 466 (D.Del.1962). There is no valid reason now for engrafting upon these decisions a buyer-seller requirement.

The polestar in this area does not involve the making of subtle buyer-seller distinctions based upon different types of stock frauds, but rather inspection of alleged violations in terms of the overriding causal connection between the fraud and plaintiff's loss. As the Supreme Court said in Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Company, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971):

"For § 10(b) bans the use of *any* deceptive device in the 'sale' of *any* security by '*any person.*' And the fact that the transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of § 10(b)." (404 U.S. at 10, 92 S.Ct. at 168) (Emphasis added).

---

7. An award of prospective relief in *Crane* would have been futile since, at the time of suit, Crane's tender-offer had been defeated, the Standard-Air Brake merger consummated, and Crane had already disposed of all but 1,000 of its 740,311 shares.

8. The stock purchase in question involved the acquisition by defendants of Treasury Stock of a closed corporation.

The Supreme Court then quoted with approval the following language:

"[We do not] think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities.' We believe that § 10(b) and Rule 10b–5 prohibit all *fraudulent schemes in connection with the purchase or sale of securities*, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." (404 U.S. at 11, 92 S.Ct. at 168). (Emphasis added).

Accordingly, this Court further holds that a buyer or seller is not required even though the securities transaction is not a typical over-the-counter one but rather is an atypical face-to-face transaction.

The third jurisdictional attack urged by defendants is that in the sphere of general corporate mismanagement there is no federal jurisdiction by virtue of Rule 10b–5, particularly where there is no buyer or seller.[9] This Court rejects the purchaser-seller requirement for the same reasons which permeate this opinion. I also reject the implication that 10b–5 jurisdiction is denied because of the presence of general corporate mismanagement.

It would be a frustration of the policy of the 1934 Act and of Rule 10b–5 if this salutary remedy were denied application in a case where a securities transaction was an integral part of the fraud merely because of some encroachment upon state fiduciary law. It is not uncommon to find breach of contract and breach of fiduciary duties alleged in a complaint which also seeks relief under Rule 10b–5. *See*, Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Entel v. Allen, 270 F.Supp. 60, 68–70 (S.D.N.Y.1967). This Circuit has recog-

nized that Rule 10b–5 is an effective compliment to state fiduciary law rather than a select remedy which can only be employed in the fortuitous absence of corporate mismanagement. In McClure v. Borne Chemical Company, 292 F.2d 824, 834 (3d Cir. 1961), cert. denied, 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), Judge Biggs stated:

"In the present case we are construing two sections of the Securities Exchange Act of 1934. That Act deals with the protection of investors, primarily stockholders. It creates many managerial duties and liabilities unknown to the common law. *It expresses federal interest in management-stockholder relationships which theretofore had been almost exclusively the concern of the states. Section 10(b) imposes broad fiduciary duties on management vis-a-vis the corporation and its individual stockholders. As implemented by Rule 10b–5 and Section 29(b), Section 10(b) provides stockholders with a potent weapon for enforcement of many fiduciary duties. It can be said fairly that the Exchange Act, of which Sections 10(b) and 29(b) are parts, constitutes far reaching federal substantive corporation law."* (Emphasis added).

■■ It would be inaccurate to conclude that Rule 10b–5 jurisdiction exists in a case of nothing more than corporate mismanagement where the purchase or sale of stock has a purely speculative impact on the cause of action. But, where there is a causal connection between the purchase or sale of stock, the alleged fraud or breach of fiduciary duty, and plaintiff's loss then federal jurisdiction under 10b–5 exists. This Court finds that the purchase of the Class A Treasury stock strikes at the very heart of this case. There is an unbroken chain linking together defendants' alleged fraud, the stock transaction and plaintiffs' loss. Accordingly, there is federal jurisdiction. *See*, Britt v. Cyril Bath

---

9. Plaintiffs have alleged several acts which, if proven, would support a claim under state law for breach of fiduciary duties.

Company, 417 F.2d 433 (6th Cir. 1969), rev'g, 290 F.Supp. 934 (N.D.Ohio 1968).

### Removal of the Subject Matter

Subsequent to the allegedly illegal acquisition by the defendants of the control Class A Treasury stock, plaintiffs submitted a notice withdrawing their Class B and Class C stock from Wakefern. Defendants contend that pursuant to the bylaws the notice amounted to a voluntary act which necessarily removed all of plaintiffs' investments, including the Class A stock, thereby destroying the technical foundation of their right to prosecute the suit.

Article X, Section 10 of the bylaws, the section under which plaintiffs withdrew, provides:

"No stockholder which [sic] together with its subsidiaries shall have accounted for 3% or more of purchases of merchandise from this corporation during this corporation's preceding fiscal year shall withdraw *all or substantially all* of its and its subsidiaries' investments in this corporation unless it shall have specified by notice in writing to this corporation the date upon which such withdrawal shall be effected, which date shall not be less than one year from the date of the delivery or mailing of such notice to this corporation. *On the date specified in said notice* this corporation shall (a) purchase all shares of capital stock of this corporation held by such stockholder and its subsidiaries, officers and directors * * *." (Emphasis added).

Defendants contend this bylaw, by operation of law, removes all investments of a withdrawing party even though that party clearly limits the investments withdrawn. This Court does not agree with that interpretation.

The notices submitted by all the plaintiffs are clear in that only the Class B and Class C stock were removed. Such a partial withdrawal is specifically provided for because the term "all or substantially all" is used in conjunction with the amount of investments which can be withdrawn. The fact that on the day of actual departure the corporation must purchase all shares of capital stock does not negate a withdrawing party's right to partially remove his assets. Moreover, there is nothing in this or any other bylaw which even remotely suggests that there is an automatic withdrawal of all investments when a withdrawing party seeks to make a partial removal before the effective date of the notice. Accordingly, this Court finds that plaintiffs still retain their Class A stock holdings in Wakefern.

Even if defendants' interpretation were accepted, jurisdiction would still exist. Initially, while plaintiffs have submitted notices of withdrawal, they remain a part of Wakefern until the effective date of the withdrawal. That date has not yet been reached. Second, and more importantly, the principle subject matter of this suit is the Class A Treasury stock. Plaintiffs could not withdraw or sell that stock even if they so desired since, at this point in time, they have neither possession nor ownership of it. Accordingly, this Court finds that the subject matter of the lawsuit is still before this Court.

### Pendent Jurisdiction

Defendants challenge this Court's jurisdiction to entertain and decide the non-federal claims joined with those claims arising under the securities laws. The initial inquiry is whether pendent jurisdiction *exists*. The test to be applied has been articulated in United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The Court stated:

"* * * The federal claim must have substance sufficient to confer subject matter jurisdiction on the court * * *. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the

federal issues, there is *power* in federal courts to hear the whole." (Citations omitted).

This Court believes that pendent jurisdiction exists.

■ The plaintiffs' federal claim is substantial. Generally speaking, the substantiality of the federal claim is to be determined on the basis of the pleadings, not upon evidence which will ultimately be introduced at trial. A. H. Emery Company v. Marcan Products Corp., 268 F.Supp. 289, 292 (S.D.N.Y.1967); aff'd, 389 F.2d 11 (2d Cir. 1968), cert. denied, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968). The substantiality of a federal claim will only be denied where it appears to be plainly unsubstantial on its face or obviously without merit. Taussig v. Wellington Fund, Inc., 313 F.2d 472, 475 (3d Cir. 1963), cert. denied, 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963); O'Brien v. Westinghouse Electric Corp., 293 F.2d 1 (3d Cir. 1961). Defendants have failed to challenge the substantiality of plaintiffs' claim. Even, however, had such a challenge been made a review of the complaint indicates that the federal claims presented are plainly substantial.

■ This Court finds that the state and federal claims derive from a "common nucleus of operative facts." This requirement is liberally construed in this Circuit. Knuth v. Erie-Crawford Dairy Coop. Association, 395 F.2d 420, 427 (3d Cir. 1968). An examination of the complaint reveals further that there is a common core of operative fact, *viz*: the allegedly illegal purchase of the Common A stock by the defendants.

The final point is whether plaintiffs would ordinarily be expected to try all their claims in one action. There is a strong policy in the law to resolve all facets of a single controversy in one suit. Clearly, neither side would gain anything by a fractionalization of this litigation. Indeed, had plaintiffs fractionalized this suit by instituting a separate action on the state claims a motion resulting in a consolidation would probably have been favorably treated. *See generally*, Roberts Brothers, Inc. v. Kurtz Bros., 236 F.Supp. 471, 473 (D.N.J.1964). Accordingly, this Court finds the existence of pendent jurisdiction. Other cases have similarly so held. *See*, Errion v. Connell, 236 F.2d 447 (9th Cir. 1956); Puma v. Marriott, 294 F.Supp. 1116 (D. Del.1969); Lorenz v. Watson, 258 F. Supp. 724 (E.D.Pa.1966); Miller v. Bargain City, U.S.A., Inc., 229 F.Supp. 33 (E.D.Pa.1964); Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962); Kohler v. Kohler Co., 208 F.Supp. 808 (E.D.Wis.1962); aff'd, 319 F.2d 634 (7th Cir. 1963); M. L. Lee & Co. v. American Cardboard & Packaging Corp., 36 F.R.D. 27 (E.D.Pa.1964); aff'd, 424 F.2d 532 (3d Cir. 1970).

While the existence of pendent jurisdiction is evident, the question of its *exercise* is not automatically conceded. A federal court may refuse to exercise its jurisdiction even though the power to decide all issues exists. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Defendants seek to bar the exercise of pendent jurisdiction because the primary issues in this case can only be determined by application of state law. While state law will be applied to resolve some issues, I do not agree with defendants' characterization that these issues are primary. Clearly, major federal issues involving Rule 10b–5 permeate this entire litigation. More importantly, counsel for both sides have expended great effort, time and money to bring this suit to its present posture. It would not only be unfair to them but also to their clients if this Court severed the state from the federal claims at this juncture. Finally, it is simply judicially inexpedient to make two suits into what can properly be disposed of in one. This Court, therefore, has decided to exercise its pendent jurisdiction.

The jurisdictional argument by defendants based on Section 5 of the 1933 Securities Act need not be considered since it will not alter this Court's decision. The remaining jurisdictional issues are without merit.

## CHOICE OF LAW

The question at this time concerns the governing law over the non-federal claims which, by virtue of pendent jurisdiction, this Court has the power to resolve. Though not critical to the result of this motion, the issue has significance from a procedural and organizational point of view.

 The prevailing view is that the non-federal claims are governed by state law. Maternally Yours v. Your Maternity Shop, 234 F.2d 538, 540 n. 1 (2d Cir. 1956); United Mine Workers v. Gibbs, supra, at 726, 86 S.Ct. 1130, 16 L.Ed.2d 218. Since neither side, however, has raised any question regarding the governing law, nor that the application of federal rather than state law will bring about a different result, reliance by this Court upon the "indeterminate general law" is justified. S. W. Farber, Inc. v. Texas Instruments Incorporated, 230 F.Supp. 883, 891 (D.Del.1964); aff'd, 344 F.2d 957 (3d Cir. 1965), cert. denied, 382 U.S. 843, 86 S.Ct. 82, 15 L. Ed.2d 84 (1965). Accordingly, in deciding the non-federal claims this Court will rely primarily upon state law but will also consider the appropriate federal law.

## PLAINTIFFS' RIGHT OF FIRST REFUSAL

 To keep the existing Class A stock structure and to purportedly protect their valuable voting rights and investments, an agreement dated April 16, 1966 was entered into restricting transfer of the Class A Treasury stock unless first offered to the plaintiffs. Plaintiffs contend that their right of first refusal was breached by the director-defendants' purchase of the Treasury stock. Defendants have raised several arguments in an effort to neutralize or nullify this agreement.

Defendants have weaved a tedious argument which concludes that the 1966 agreement does not restrict transfers from outsiders, such as Wakefern, to subsequent transferees such as defend-

ants. This interpretation would mean that plaintiffs entered into a crucial agreement after which the control stock was placed, without objection by them, in the hands of an entity free to ignore the terms of that contract. Such was clearly not their intent. Instead, Wakefern, whether labelled a party or not, was nonetheless bound to comport its conduct to the agreement.

Article XI of the agreement provides:

### "PARTIES IN INTEREST

This Agreement shall inure to the benefit of, *and be binding upon, Wakefern* and upon the parties hereto, and their respective estate, personal representatives, heirs, successors and assigns." (Emphasis added).

Moreover, Wakefern "Approved and Agreed to" the terms of the agreement, which action was authorized at a Board of Directors meeting. Thus, it is evident that Wakefern was contractually obligated to comply with plaintiffs' right of first refusal.

Defendants' second contention is that plaintiffs' right of first refusal attaches only to a *transfer* by Wakefern as opposed to a *sale*. Such a distinction is one *without meaning*. The word transfer is more comprehensive than sale and necessarily embraces the concept of selling. In re Garvin's Estate, 335 Pa. 542, 6 A.2d 796, 800. As the Court in Wallach v. Stein, 103 N.J.L. 470, 472, 136 A. 209, 210 (E. & A.1927) stated:

> " * * * The language used is the 'transfer of shares.' It implies any means whereby one may be divested of and another acquire the ownership of stock. *It would be difficult to select a word of more comprehensive import than that employed here,* * * * *."
> (Emphasis added).

Accordingly, this Court holds that the term transfer includes the notion of sale. As such, plaintiffs' right of first refusal attached to the sale by Wakefern to defendants.

 Defendants' third contention is that the agreement, which was not ap-

proved at a stockholders' meeting, violates the Certificate of Incorporation by granting preemptive rights to the plaintiffs. This contention is easily disposed of. The continuing right of first refusal which plaintiffs allege they possess cannot be considered in terms of preemptive rights. A right of preemption only has relevance where there are new shares or new issues. Treasury stock does not fall within either of those categories. Thus, the right of first refusal in the Treasury stock cannot conceivably violate the Certificate of Incorporation. 11 W. Fletcher, Fletcher Cyclopedia Corporations, § 5136.2 (Perm. Ed.1971).

■■■ The fourth contention raised by defendants is that the right of first refusal is somehow an unlawful restraint on alienation. Agreements such as the one in question are clearly legal and enforceable by statute in New Jersey. N.J. S. 14A:7–12.[10] While there is a general public policy against restraints on the transfer of personal property, a right of first refusal does not prevent a transfer but merely delays it. Such first options are likewise valid under both New Jersey and Federal case law. Baumohl v. Goldstein, 95 N.J.Eq. 597, 124 A. 118 (Ch. 1924); Palmer v. Chamberlin, 191 F.2d 532 (5th Cir. 1951); Ryan v. J. Walter Thompson Company, 322 F.Supp. 307 (S.D.N.Y.1971); Sankin v. 5410 Connecticut Avenue Corporation, 281 F. Supp. 524 (D.C.1968); aff'd, 410 F.2d

1060 (D.C. Cir. 1969), cert. denied, 396 U.S. 1041, 90 S.Ct. 681, 24 L.Ed.2d 685 (1970).

■■■ The final point raised by defendants is that the sale of the A stock to Wakefern in 1967 without plaintiffs exercising their right of first refusal constituted a waiver. Defendants have not pressed this point in their brief or on oral argument. This Court will, nevertheless, consider it.

Plaintiffs contend that when the A stock went into the Wakefern Treasury they believed that it remained subject to their right of first refusal. If this were the case, and defendants have not otherwise alleged, it cannot amount to "an intentional relinquishment of a known right." Deerhurst Estates v. Meadow Homes, Inc., 64 N.J.Super. 134, 145, 165 A.2d 543, 549 (App.Div.1960), certif. denied, 34 N.J. 66, 167 A.2d 55 (1966). Indeed, since the agreement specifically bound Wakefern to comply with plaintiffs' right of first refusal, plaintiffs had no obligation or reason to believe that the had to protect their right by exercising it. Under such circumstances a waiver cannot be found. See, First National Bank of Canton v. Shanks, 34 DO. 359, 73 N.E.2d 93.

■■■ In light of the foregoing this Court finds that plaintiffs have a strong probability of proving at trial that the 1966 agreement gives to them a valid contractual right of first refusal in the Class A Treasury stock.

10. N.J.S. 14A:7–12 provides:
"(2) Any reasonable restriction on the transfer or registration of transfer of shares, or other securities having conversion or option rights, may be enforced against the holder of the restricted securities and any successor or transferee of the holder, including any fiduciary entrusted with responsibility for the person or property of the holder. Such restriction shall be valid only if imposed by the certificate of incorporation or by-laws [sic] or by the provisions of an employee benefit plan permitted by Chapter 8 of this act, *or by a written agreement among any number of shareholders or* among such holders and the corporation * * *."

"(3) In particular and without limitation of the generality of the power granted by subsection 14A:7–12(2) to impose restrictions, a restriction on the transfer or registration of transfer of shares, or other securities having conversion or option rights, may be enforced as provided in subsection 14A:7–12(2), if it: (a) obligates the holder of the restricted securities to offer to the corporation or to any other holders of securities of the corporation or to any other person or to any combination of the foregoing, a prior opportunity, to be exercised within a reasonable time, to acquire the restricted securities;"

## PLAINTIFFS' PROBABILITY OF ULTIMATE SUCCESS

It is an established principle that as a prerequisite to the issuance of a preliminary injunction the movant must show that there is a clear probability of ultimate success. Ikirt v. Lee National Corporation, 358 F.2d 726, 727 (3d Cir. 1966); Swartz v. Chrysler Motor Corp., 297 F.Supp. 834, 835 (D.N.J. 1969). If, however, other elements for issuing a preliminary injunction exist then plaintiffs' probability of ultimate success need not be absolutely certain or wholly free from doubt. This proposition was recognized and applied in a case similar to the one at bar. Vanadium Corp. of America v. Susquehanna Corp., 203 F.Supp. 686, 697 (D.Del. 1962); see particularly, Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953). Although this Court finds the probability of ultimate success to be clear, plaintiffs' burden of proof is somewhat lessened because, as will be discussed hereafter, the irreparable harm and balance of hardships clearly preponderate in their favor.

### Breach of Fiduciary Duties

The first of two alternate theories upon which plaintiffs have a probability of ultimate success is that defendants, as directors, breached their fiduciary duties owed to plaintiffs, as stockholders, by purchasing the control Treasury stock. Hill Dredging Corp v. Risley, 18 N.J. 501, 530–31, 114 A.2d 697, 712 (1955); Daloisio v. Peninsula Land Co., 43 N.J.Super. 79, 88–91, 127 A.2d 885, 890 (App.Div.1956); Eliasberg v. Standard Oil Co., 23 N.J.Super. 431, 441, 92 A.2d 862, 867 (Ch.Div.1952), certif. denied, 12 N.J. 467, 97 A.2d 437 (1953); Pilat v. Broach Systems, Inc., 108 N.J. Super. 88, 94, 260 A.2d 13, 16 (L.Div. 1969).

The defendant-directors purchased the control stock without having obtained prior stockholder approval nor have the stockholders formally ratified the purchase. Under such circumstances the ramifications of a director's duty are pervasively scrutinized. Indeed, at trial the burden of justifying this transaction as being for a valid corporate purpose must be shouldered by the director-defendants. In construing New Jersey law this Circuit observed in Pappas v. Moss, 393 F.2d 865, 868 (3d Cir. 1968):

> "There having been no effective ratification, the stock sales must be evaluated as though there had been no stockholder action. In that posture, the New Jersey law, as we find it, required the defendants to establish by clear and convincing proof that the transaction was honest, fair and reasonable."

At trial, therefore, the defendants must prove by clear and convincing proof that they did not use their fiduciary position for their personal benefit and without a valid corporate purpose in mind. If that burden is not met the transaction can be voided by the plaintiffs. Daloisio v. Peninsula Land Co., supra, at 88–91, 127 A.2d 885. In terms of obtaining a preliminary injunction, evidence at this time indicating defendants' inability to meet their burden at trial proportionately increases plaintiffs' probability of ultimate success. There is ample evidence of such inability.

Benjamin Franklin once said that "every so often the tree of liberty must be watered by the blood of tyrants." This statement summarizes what defendants have proffered as their corporate purpose for the purchase of the control Treasury stock. Defendants view that purchase as an effort to neutralize plaintiffs' domination and tyrannical rule by guaranteeing to themselves and all others similarly situated, equality, freedom of expression, liberty and a generally democratic corporation structure. The sworn testimony of the director-defendants deposed to date belies such a noble purpose.

According to defendants' testimony they felt that the plaintiffs had the power, by virtue of their voting control, to act unfairly toward all Class B and C stockholders. Yet, each of the four di-

rector-defendants deposed to date were unable to recall one instance of a discriminatory exercise of that power. They admitted that in the many years preceding the allegedly illegal seizure the plaintiffs had elected eight exclusively C stockholders to the Board. (433). In 1970 alone the Board consisted of only four A stockholders and sixteen C stockholders. (434). They admitted that their votes at Board or committee meetings were the product of their own free will uninfluenced by any of the plaintiffs. (435). Finally, they testified that the corporate growth was financially rewarding for themselves, their business and Wakefern. The general tenor of the testimony is reflected in a statement by defendant Romano. He said:

> "I don't think that we really could have more to say than we had. We were a very democratic group. We were always treated as such." (452).

In light of the many admissions by these director-defendants this Court finds an incongruity between the purportedly corporate justification for the purchase of the Treasury stock and the actual corporate situation. This incongruity enhances plaintiffs' probability of success since defendants appear incapable of proving by clear and convincing proof at trial the fairness and honesty of their purchase. The inability to validly explain the acquisition by interested directors of corporate stock in the absence of stockholder approval or ratification is a breach of fiduciary duty. Pappas v. Moss, 393 F.2d 865 (3d Cir. 1968); Hill Dredging Corp. v. Risley, supra; see, Elliott v. Baker, 194 Mass. 518, 80 N.E. 450 (1907); Johnson v. Duensing, 351 S.W.2d 27 (Mo.1961).

There is one additional consideration casting further doubt upon defendants' proffered corporate purpose. On April 19, 1971 plaintiffs went to the Wakefern offices in Elizabeth. On this occasion, pursuant to their alleged right of first refusal, they tendered checks in sufficient amounts to purchase all of the 666⅔ shares of the Class A Treasury stock. They also demanded the right to inspect the stock books and the Class A share certificates. Both the tender and demand for inspection were denied at the direction of some of the defendant-directors.

When plaintiffs left the premises the A stock certificates were removed from the briefcase of one who had previously denied plaintiffs access to them. The certificates were signed and issued to all defendants at approximately midnight. Plaintiffs allege, an defendants apparently do not controvert, that the stock was issued by individuals who did not have bylaw authority. Such clandestine nocturnal activities certainly are inconsistent with the high duty of fairness and honesty owed by the defendant-directors to the plaintiffs.

### Volation of Rule 10b–5

In addition to proving breach of fiduciary duties, plaintiffs also have a probability of ultimate success by proving, in the alternative, a violation of Rule 10b–5.[11]

■ While Rule 10b–5 does not specifically authorize plaintiffs' request for a civil remedy, courts have unanimously held that a civil cause of action may be prosecuted by a private person to enforce it. Kardon v. National Gypsum Co., 69 F.Supp. 512, 514 (E.D.Pa.1946); Mills v. Sarjem Corp., 133 F.Supp. 753, 762 (D.N.J.1955). Accordingly, the civil nature of the remedy sought does not bar application of Rule 10b–5.

■ Plaintiffs must initially prove that there has been a purchase or sale of securities. This essential has been met

---

11. Plaintiffs' probability of success under 10b–5 is contingent upon their right of first refusal. This Court believes such right to be clear. Should, however, the 10b–5 claim fail, plaintiffs would still be entitled to a preliminary injunction because of the breach of fiduciary duties. Furthermore, the failure of the right of first refusal is not jurisdictional but goes only to the probability of ultimate success as to that particular claim.

by the purchase of Treasury stock which is a purchase of securities within the purview of Rule 10b–5. Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964); Rekant v. Desser, 425 F.2d 872 (5th Cir. 1970).

Clauses 1 and 3 of Rule 10b–5 are essentially the same.[12] Both require a showing of some scheme to defraud or fraudulent course of business which are connected with the purchase or sale of securities. Such showing of fraud need not satisfy all of the rigid requirements of the common law. Britt v. Cyril Bath Company, 417 F.2d 433 (6th Cir. 1969); Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962). Plaintiffs have made a showing of 10b–5 fraud leading this Court to believe that a probability of ultimate success is present.

Before detailing the evidence, there is an evidentiary overlap between proof of 10b–5 fraud and proving breach of fiduciary duties. This Court, therefore, incorporates by reference all the factual proofs in the fiduciary duty discussion. Likewise, the facts to be outlined herein are also applicable to the fiduciary duty portion of this opinion.

There is ample testimony by some of the director-defendants which evidences fraud in the purchase of the Treasury stock. On April 8, 1971 a Board meeting was held at which a resolution was adopted offering for purchase to the defendants, as well as plaintiffs, proportionate shares of the control stock. Such interest offered to plaintiffs was drastically less than what they believed, in light of their right of first refusal, they had the right to buy. For approximately six months in advance of this meeting the defendant-directors met secretly, and to the exclusion of all plaintiffs, for the purpose of planning the adoption of the April 8th resolution.

Not once during this six month period did defendants ever intimate to plaintiffs the plan they were developing even though some, if not all, of the director-defendants were cognizant of plaintiffs' alleged right of first refusal. The deposition testimony of defendant-director Wolfson is revealing. In explanation of the failure to make plaintiffs part of the planning he stated:

"I don't have a valid reason for that. I can't give you a reason for that. It was never the thing to do at the time. I didn't feel like discussing it with them." (103).

Given the enormous effect of the resolution such an explanation is, at best, weak. Indeed, considering that plaintiffs believed they had a right of first refusal, that they had been the originators and founders of Wakefern, that they had maintained a position of control, that they were stockholders to whom a fiduciary duty was owed, and that there was constant contact between plaintiffs and defendants while these secret meetings were going on, renders defendants' conduct particularly suspect.

The secretive conduct of the director-defendants continued up to the very moment before the April 8th Board meeting. Prior to it a caucus by the defendants was held. Needless to say, plaintiffs were not present. It lasted about one hour during which time a typewritten copy of the proposed resolution was distributed. They then agreed in advance to adopt it. (442). When the meeting convened plaintiff Henry, who was then President of Wakefern, noted the presence of defendants' personal counsel. As a result, he asked for an immediate adjournment. When the vote was taken on this request the same director-defendants who had attended the earlier secret meetings refused to adjourn. (523). The vote was called for and the resolution was adopted, without discussion, over plaintiffs' objections. The ultimate transfer of the stock was made at midnight on April 19th.

12. *Supra*, note 3.

■ In light of the foregoing this Court finds that plaintiffs have a probability of successfully proving a violation of Clauses 1 and 3 of Rule 10b–5.

■ This Court also finds that Clause 2 of Rule 10b–5 may have been violated.[13] Although not discussed by either side, defendants' omission to disclose their plan could amount to a non-disclosure of material facts in breach of their duty as insiders. As directors, the defendants are insiders with an obligation to disclose known facts unavailable to plaintiffs which defendants reasonably should have known would be important to them. Securities & Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Clearly, the contemplated plan to purchase would be a material fact in plaintiffs' decision to "buy, sell or hold." Securities and Exchange Commission v. Texas Gulf Sulphur Co., supra, at 850. Thus, defendants' nondisclosure may very well have violated their affirmative duties of disclosure as insiders in violation of Clause 2 of Rule 10b–5.

The requisite causal connection is, in this Court's opinion, present. The allegedly fraudulent scheme was geared solely to the purchase of the control Treasury stock. That scheme was a substantial factor and proximately resulted in defrauding plaintiffs as stockholders as well as denying plaintiffs the opportunity to exercise their alleged right of first refusal. The acquisition of the control stock signalled the beginning of plaintiffs' irreparable injury.

### IRREPARABLE INJURY

■ It is well established in this Circuit that before a preliminary injunction can be issued a showing by the movants of irreparable injury is essential. Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292 (3d Cir. 1940); Evening News v. Allied Newspaper Carriers, 149 F.Supp. 460, 462–463 (D.N.J.1957), cert. denied, 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959); Eutectic Welding Alloys Corp. v. Zeisel, 11 F.R.D. 78, 79 (D.N.J.1950). It is further well established that the movant must demonstrate that the irreparable injury which will be incurred cannot be adequately compensated by money damages. Henis v. Compania Agricola Guatemala, 116 F.Supp. 223, 225 (D.Del.1953); aff'd, 210 F.2d 950 (3d Cir. 1954); Uniformed Sanitation Men Ass'n. v. Commissioner of San., 287 F.Supp. 703 (S.D.N.Y.1968). This Court considers irreparable harm in its generic sense being comprised of two component parts, viz: substantial injury to a material degree coupled with the inadequacy of money damages. The requisite irreparable injury, as defined above, exists.

Since acquisition of the control Treasury stock defendants have evinced a willingness and inclination to harm the plaintiffs. This bent is glaringly manifested in two basic areas. The first such area involves approval of new site applications. For example, Foodarama's most recent application was shelved for several months without reason by the inaction of the defendant-controlled Board of Directors. Traditionally, such applications had been processed with little or no delay. While this application has been recently approved, it was done so only after this motion had been filed and Foodarama had been inconvenienced. Clearly, judicial intervention, at least in part, prompted their action.

The more critical area of injury emanates from plaintiffs' notices of withdrawal. Following the allegedly illegal seizure of control stock plaintiffs took certain steps to protect their interests. It was their considered opinion that they should institute this lawsuit as well as, for several reasons, file notices of withdrawal to become effective October 7, 1974. The plaintiffs believed that the date selected would permit them to effectively litigate their claims and, in the event of an adverse ruling, they would still be able to withdraw from

---

13. *Supra*, note 3.

Wakefern in an orderly manner and with a minimum of economic injury and inconvenience.

On October 21, 1971 a resolution offered by director-defendant Singer was adopted by the Board of Directors. The resolution accelerated plaintiffs' withdrawal by roughly two years. This "ouster," as it has been called, gives plaintiffs Tully and Henry five months to exit and plaintiff Foodarama about eleven months.

This resolution harms plaintiffs in several ways. They will be deprived of the opportunity to litigate the issues of ouster and use of the name "Shop-Rite" because they will be moot. Such a result cannot be sanctioned since a defendant is not permitted to stifle a plaintiff's cause of action after inception of the litigation. Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3d Cir. 1962). But more importantly to plaintiffs is the extreme economic hardships, if not total bankruptcy, the accelerated withdrawal would cause.

Broadly stated, plaintiffs will be cast out of Wakefern without sufficient time to acquire a new private label to replace "Shop-Rite" or to find a suitable substitute for the Wakefern services and supplies. By affidavit, plaintiff Saker, Foodarama's Chairman of the Board and Chief Executive officer, indicated that an orderly and economically feasible withdrawal could only be accomplished in a minimum of two and one-half to three years. Some difficult problems would involve the location and purchase of new warehouse sites; applying for and obtaining necessary zoning changes; obtaining financing for the purchase or construction of the new warehouses; developing new computer programs and the negotiations for a new private label. That the resolution accelerating withdrawal is simply insufficient in point of time and will cause irreparable injury is unquestionable.

There is one final reason which compels judicial action to halt the acceleration. Over fifty-two million people have, in one way or another, utilized the services of plaintiffs' stores during the last fiscal year. The harm visited upon plaintiffs by the acceleration would necessarily flow to the detriment of the innocent customers. In addition, to jeopardize the employment of thousands of persons is simply impermissible. Finally, at least with respect to Foodarama, which is a publicly held corporation, the investments of its stockholders would be imperiled by such an unreasonable timetable. To avert the problems caused by this internecine struggle this Court must act.

That damages are not an adequate remedy is patent. Items incidental to the loss of the "Shop-Rite" label as well as the Wakefern warehouse facilities and services cannot be translated into money damages. This Court would find it virtually impossible to put a collective dollar and cent valuation on such items as cost savings, customer loyalty and private "Shop-Rite" label.

For the foregoing reasons this Court finds that the accelerated notice of withdrawal will cause plaintiffs irreparable injury. All other arguments raised by defendants in opposition to issuance of an injunction are without merit.

### RELIEF

In determining the appropriateness of the relief requested this Court has wide latitude to mold its remedy to meet the exigencies of the particular case. J. I. Case Co. v. Borak, 377 U.S. 426, 433–434, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). This Court will be guided by two precepts in reaching its decision. First, a balance must be struck in granting an injunction between the harm the movants seek to avert as opposed to the harm caused to the other side by its issuance. Eutectic Welding Alloys Corp. v. Zeisel, 11 F.R.D. 78, 79 (D.N.J.1950). Second, injunctive relief should not be used to undo completed transactions nor to give a type of relief which, by its nature, is more suitable after there has been a plenary hearing on the merits. Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292 (3d Cir. 1940); I. C. C. v.

852

Hudson Transportation Co., 174 F.Supp. 373, 376 (D.N.J.1959).

■ The root cause of this entire lawsuit stems from the allegedly illegal acquisition of the control Treasury stock. Graphic illustration of this is that both prior to and after its acquisition the composition of the Board of Directors, with the exception of one, was identical. Yet, after the purchase of the control stock the conduct of the very same defendant-directors toward plaintiffs radically change, as outlined above, to plaintiffs' detriment. To avoid any additional injury this Court is, therefore, ordering all defendants to place all of the Treasury stock in their hands with a Court-appointed escrow holder within five days after the entry of an order herein. All defendants will retain all of the incidents of ownership with the exception of the right to vote the stock. Thus, the validity of the acquisition is not undone but, rather, a restriction on its voting use is affixed to it pending the outcome of a final hearing on the merits.

Because this Court has felt the need to restrain future voting of the control stock, it is obligated to assure that defendants will suffer the minimum, if any, injury. This Court will not declare invalid the May 24, 1971 election of directors and officers. Such a rollback would undo a completed transaction, something this Court is seeking to minimize, as well as harm defendants without measurably aiding plaintiffs. As noted, the present composition of the Board of Directors is virtually identical. Ordering a rollback in this instance would, therefore, be a vain act. As to the officerships, a rollback is likewise not required. Some plaintiffs were offered positions as officers in the new "regime." That they may not have been offered the positions they felt entitled to is not an issue for resolution at this time. More importantly, however, the source of the harm is not the officerships but rather is the control stock. Since this stock can no longer be relied upon by defendants as a bludgeon which could be used to hammer plaintiffs into

submission, there is every reason to expect that plaintiffs will be fairly treated by defendants.

This Court will not order a new election. Quite the contrary, this Court is freezing the present composition of officers and directors pending a final determination on the merits. Having restrained the control stock, a new election might well see the ouster by plaintiffs, because they would then have voting control, of the defendant-directors as well as officers. Since defendants have been disarmed then so too must plaintiffs. The corporate entity is in no way injured by such a freeze since the men in control have long proven their ability to effectively administer Wakefern. Moreover, this Court will treat favorably reasonable requests by counsel for a relatively early trial date thus shortening the duration of the freeze.

This Court is ordering a modification of the October 21, 1971 acceleration resolution so as to permit plaintiffs to remain in Wakefern for a period of 18 months after the final determination of this lawsuit, or October 7, 1974, whichever is sooner. This modification is contingent upon the occurrence of two conditions. First, plaintiffs must make their proportionate contributions to any reasonable capital expenditures incurred subsequent to their notices of withdrawal and up to and including a final determination on the merits. Second, plaintiffs must submit within 60 days from the filing of an order herein a plan for their systematic phased-out withdrawal. Defendants cannot conceivably be harmed by such a ruling since they have admitted their desire to have plaintiffs remain in Wakefern under the aforementioned conditions.

Permeating this order is an overriding requirement that neither side during the course of this litigation shall intentionally act to the harm of the other. This Court will remain available to both sides as an avenue of final recourse should any part of this order be breached. In such an event this Court will consider the conduct as being in con-

tempt and will deal with it accordingly. Should circumstances change during the course of this litigation, this Court will entertain applications to modify the order. Counsel for plaintiffs shall submit an appropriate order granting a preliminary injunction in conformity with the preceding opinion. No costs will be allowed.